IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ESTATE OF JACOB WILLIAM FERRELL, by and through James Eric Ferrell, administrator, and JAMES ERIC FERRELL, individually and on behalf of the heirs of Jacob William Ferrell,**<br><br>**Plaintiffs**,<br><br>v.<br><br>**KB CUSTOM AG SERVICES LLC and KYLE D. BEAUCHAMP,**<br><br>**Defendants**. | **Case No. 23-2384-DDC** |

## MEMORANDUM AND ORDER

Jacob William Ferrell tragically died from injuries he sustained in a car accident. His vehicle collided with a truck operated by an employee of defendant KB Custom Ag Services LLC. James Eric Ferrell—Jacob's father—sued KB Custom and defendant Kyle D. Beauchamp, the owner and CEO of KB Custom. Mr. Ferrell brings the suit as the administrator of his son's estate, individually, and on behalf of his son's heirs. This Order resolves three pending motions.

*One*, plaintiffs moved for partial summary judgment against defendants' contributory-negligence affirmative defense.[1] Doc. 79. This Order denies that motion. *Two*, defendants

---

[1]     Plaintiffs' motion asks for summary judgment against defendants' "negligent entrustment *claim* against James Eric Ferrell." Doc. 79 at 1 (emphasis added). But the Pretrial Order doesn't reflect that defendants have asserted any claims in this action. *See generally* Doc. 78. Instead, defendants have asserted negligent entrustment as a basis for their contributory-negligence defense, which argues that "the jury must compare the fault of Plaintiff James Eric Ferrell[.]" *Id.* at 14 (Pretrial Order ¶ 4(b)(13)). The court thus construes plaintiffs' motion as one seeking summary judgment on this affirmative defense. *See* Fed. R. Civ. P. 56(a) (permitting parties to move for summary judgment on a defense).

moved for partial summary judgment—seeking summary judgment on several claims and theories. Doc. 82. The court grants in part and denies in part that motion. *Three*, defendants ask the court to exclude categories of testimony by an expert witness plaintiffs intend to present at trial. Doc. 84. This Order grants in part and denies in part that motion, too.

The court starts with the factual background underpinning this lawsuit.

## I.    Background

The following facts are uncontroverted unless otherwise noted.

### Collision

On May 12, 2023, a Kia Optima—driven by Jacob Williams Ferrell—and a 2015 Kenworth truck—driven by Isidro Borbolla-Fierro—collided. Doc. 78 at 2 (Pretrial Order Stipulations ¶ 2(a)(1)). The collision occurred near the intersection of County Road 11 and County Road G in Seward County, Kansas. *Id.* Before colliding, Mr. Borbolla-Fierro was traveling eastbound on County Road 11. *Id.* (Pretrial Order Stipulations ¶ 2(a)(2)). And Jacob Ferrell was traveling northbound on County Road G. *Id.* Eastbound traffic on County Road 11 encounters a yield sign at the intersection of County Road 11 and County Road G. *Id.* (Pretrial Order Stipulations ¶ 2(a)(3)). Jacob Ferrell suffered injuries from the collision and died from those injuries on May 17, 2023. *Id.* (Pretrial Order Stipulations ¶ 2(a)(4)). His minor daughter, S.F., survives him. *Id.* (Pretrial Order Stipulations ¶ 2(a)(6)).

The court refers to James Eric Ferrell—decedent's father and S.F.'s grandfather—as Mr. Ferrell. The court refers to Jacob William Ferrell as the decedent.

### Mr. Borbolla-Fierro

Mr. Borbolla-Fierro, the driver of the semitruck, worked for KB Custom at the time of the accident. *Id.* at 3 (Pretrial Order Stipulations ¶ 2(a)(11)). The Secretary of Communications and Transportation of Mexico granted Mr. Borbolla-Fierro a Licensia Federal de Conductor in

2019.  *Id.* (Pretrial Order Stipulations ¶ 2(a)(12)).  That license authorized Mr. Borbolla-Fierro to operate a commercial motor vehicle in the United States.  *Id.*  Prior to the vehicle collision, no authority ever had suspended or revoked Mr. Borbolla-Fierro's driver's license.  Doc. 83-2 at 3 (Borbolla-Fierro Dep. 62:6–8).[2]  Nor has Mr. Borbolla-Fierro ever suffered reprimand from a government agency or employer based on his operation of a motor vehicle.  *Id.* at 6–7 (Borbolla-Fierro Dep. 74:21–75:3).  The record contains conflicting evidence on Mr. Borbolla-Fierro's ability to understand traffic signs.  When asked whether he could "understand highway signs like yield signs and stop signs[,]" Mr. Borbolla-Fierro responded, "Yes, the basic."  Doc. 83-2 at 8 (Borbolla-Fierro Dep. 177:21–25).  When the same question was reread and reinterpreted for Mr. Borbolla-Fierro, he responded, "Yes, I can recognize them because I know the basic of English."  *Id.* at 10 (Borbolla-Fierro Dep. 179:5–14).  But Mr. Borbolla-Fierro also testified that he felt that he could not "read and speak English sufficiently to understand highway traffic signs and signals in the English language[.]"  Doc. 88-2 at 25 (Borbolla-Fierro Dep. 132:3–6).

### KB Custom Ag Services

KB Custom is a harvesting company.  Doc. 83-1 at 6 (Beauchamp Dep. 323:5–9).  Dairies and feedlots contract with KB Custom to harvest silage.[3]  *Id.*  KB Custom's drivers transport harvested silage from fields to dairies and feedlots within 150 miles of the truck-

---

[2]     Plaintiffs' response to this asserted fact reads, "Uncontroverted he testified."  Doc. 88 at 6.  Plaintiffs go on to explain that KB Custom didn't run a motor-vehicle check on Mr. Borbolla-Fierro.  Because plaintiffs didn't "specifically controvert[]" this statement of fact, the court deems it "admitted for the purpose of summary judgment[.]"  D. Kan. Rule 56.1(a).  Whether or not KB Custom followed best practices in performing its background check, plaintiffs haven't cited any record evidence to controvert Mr. Borbolla-Fierro's assertion that authorities never have suspended or revoked his driver's license.

[3]     "Silage" is "fodder (such as hay or corn) converted into succulent feed for livestock through processes of anaerobic bacterial fermentation (as in a silo)[.]"  *Silage*, Merriam-Webster, https://www.merriam-webster.com/dictionary/silage [https://perma.cc/8JNX-PKRA] (last visited July 31, 2025).

loading location. *Id.* at 6–7 (Beauchamp Dep. 323:23–324:9).[4] Mr. Beauchamp is the sole

owner of KB Custom, a limited liability company. *Id.* at 2, 5 (Beauchamp Dep. 11:10–11,

259:2–4). Every year, Mr. Beauchamp receives a list of drivers—a list which has included Mr.

Borbolla-Fierro in the past. Doc. 88-1 at 14 (Beauchamp Dep. 61:8–24). Mr. Beauchamp has

ultimate authority to decide whether to bring drivers back. *See id.* at 53 (Beauchamp Dep.

244:6–24).[5]

KB Custom had hired Mr. Borbolla-Fierro in 2020 as an H-2A truck driver. Doc. 78 at 3

(Pretrial Order Stipulations ¶ 2(a)(11)). And Mr. Borbolla-Fierro had worked for KB Custom in

the United States for each subsequent harvest season. *Id.* At the time of the collision, Mr.

Borbolla-Fierro was in the course and scope of his employment with KB Custom. *Id.* (Pretrial

Order Stipulations ¶ 2(a)(5)). He was transporting harvested wheat to storage or market when

the accident occurred. Doc. 83-1 at 9 (Beauchamp Dep. 326:1–11). Another employee of KB

---

[4]     Plaintiffs controvert this fact. Doc. 88 at 2. But no record evidence supports plaintiffs' position.
Plaintiffs direct the record to evidence that (1) KB Custom does work in Texas, Kansas, Oklahoma,
Colorado, Missouri, New Mexico, Wyoming, and Nebraska; (2) Mr. Borbolla-Fierro has an office for his
work for KB Custom in Texas; (3) Mr. Borbolla-Fierro has a personal pickup truck, which he used to
travel to Texas; (4) Jason West, one of KB Custom's crew leaders, splits his time between Texas and on-
road activity; (5) Blake Winchester, an operations manager for KB Custom, lives in Texas but spends
most of his time in Kansas; (6) Winchester's subordinates spend a lot of time traveling between Kansas
and Texas; and (7) Winchester personally has worked in Texas, Kansas, Oklahoma, and New Mexico. *Id.*
None of these points responds to defendants' assertion. Even if KB Custom's drivers traverse great
distances during their employment, that says nothing about how far—or here, how short—they travel
between where they load their trucks to where they deliver the silage.

[5]     Defendants controvert this fact. Doc. 90 at 5. They argue that Mr. Beauchamp testified that the
decisions were collaborative and that Mr. Beauchamp wasn't involved in every decision. *Id.* (citing Doc.
90-2 at 17–18 (Beauchamp Dep. 244:6–245:5)). But Mr. Beauchamp confirmed twice that he has
ultimate authority over company decisions. Doc. 90-2 at 17 (Beauchamp Dep. 244:9–24). And
regardless, this fact only matters to defendants' partial motion for summary judgment, so the court must
view this fact in the light most favorable to plaintiffs. *See Scott v. Harris*, 550 U.S. 372, 378 (2007)
("[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the
party opposing the summary judgment motion." (quotation cleaned up)). Doing so, the court concludes
that a rational factfinder could find that Mr. Beauchamp had ultimate authority over firing and retention
decisions.

Custom—not Mr. Beauchamp—assigned the 2015 Kenworth to Mr. Borbolla-Fierro to drive on the day of the accident.  *Id.* at 14 (Beauchamp Dep. 347:6–12).

### Long Hours

Mr. Borbolla-Fierro worked extensive hours in the weeks before the collision.  For example, between April 10 and April 23, 2023, Mr. Borbolla-Fierro worked over 176 hours with no days off.  Doc. 88-2 at 28–29 (Borbolla-Fierro Dep. 154:20–155:15).  Between May 1 and May 7, 2023, Mr. Borbolla-Fierro worked 100.15 hours for KB Custom.  Doc. 88-1 at 21 (Beauchamp Dep. 110:17–19).  The accident occurred on a Friday.  The Monday before the collision, Mr. Borbolla-Fierro had worked a 14-hour, 54-minute day.  *Id.* at 24–25 (Beauchamp Dep. 113:24–114:2).  Tuesday, he worked a 15-hour, 44-minute day.  *Id.* at 25 (Beauchamp Dep. 114:3–4).  Wednesday, 17 hours and 33 minutes.  *Id.* (Beauchamp Dep. 114:5–6).  And Thursday, 12 hours and 19 minutes.  *Id.* (Beauchamp Dep. 114:7–10).  And on the day of the collision, Mr. Beauchamp started work at 6:29 a.m.  *Id.* (Beauchamp Dep. 114:11–14).  The collision took place more than 11 hours later, at 5:48 p.m.  Doc. 88-10 at 1 (Pl. Ex. J) (motor vehicle crash report showing time of crash at 17:48).[6]

### Right of Control of Kia Optima

The parties dispute whether and to what extent Mr. Ferrell could have stopped the decedent from driving the car.  At his deposition, Mr. Ferrell testified that he was the exclusive owner of the Kia Optima.  Doc. 86-1 at 6 (Ferrell Dep. 40:21–41:18).  He also testified that he paid for insurance on the vehicle.  *Id.* at 6–7 (Ferrell Dep. 41:15–42:5); *id.* at 8 (Ferrell Dep.

---

[6]    Defendants "[c]ontrovert[] in part" many of the assertions in this paragraph.  Doc. 90 at 6.  They explain that Mr. Borbolla-Fierro didn't drive the entire time that he was on the clock and that drivers have some downtime during their days.  *Id.*  But that doesn't contradict any assertion in this paragraph.  Mr. Borbolla-Fierro was on the clock all the time listed in this paragraph.  Regardless of what he was doing while he was on the clock, he was working.  Defendants have thus failed to controvert any of these facts.

122:10–11).  And occasionally, he split car payments with the decedent.  *Id.* at 8 (Ferrell Dep. 122:9–10).  Mr. Ferrell also explained that because he was the titled owner of the vehicle, he had the right to take the keys away from the decedent at any time.  *Id.* at 7 (Ferrell Dep. 42:6–10).

Several months after his deposition, Mr. Ferrell submitted an affidavit.  Doc. 61-2 (Ferrell Aff.).  This affidavit changes tack.  It explains that Mr. Ferrell "was mistaken in [his] deposition when [he] said that [he] didn't believe [the decedent] was a titled owner."  *Id.* at 1 (Ferrell Aff. ¶ 10).  He further explains that he became aware of this error when his attorneys located the vehicle's title.  *Id.* (Ferrell Aff. ¶ 11).  Sure enough, the vehicle's title—printed two days after the collision—shows both the decedent and Mr. Ferrell listed as owners.  Doc. 61-1 at 1.  In the affidavit, Mr. Ferrell concludes that he "could not have taken the keys away from [the deceased] or precluded him from driving that car."  Doc. 61-2 at 2 (Ferrell Aff. ¶ 12).

The court now addresses the legal standard governing summary judgment motions.

## II.      Summary Judgment Legal Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144 F.3d at 671). Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

The court next addresses plaintiffs' Motion for Partial Summary Judgment (Doc. 79) before turning to defendants' Motion for Partial Summary Judgment (Doc. 82).

## III.    Plaintiffs' Motion for Partial Summary Judgment (Doc. 79)[7]

Plaintiffs move for summary judgment against defendants' contributory-negligence defense based on purported negligence by Mr. Ferrell. Doc. 79 at 1.

Under "the Kansas law of comparative negligence, a defendant has a right to have the fault of all participants in an occurrence measured in one action, and to reduce his or her liability by the amount of fault attributable to the other participants[.]" *Hefley v. Textron, Inc.*, 713 F.2d 1487, 1496 (10th Cir. 1983) (citing Kan. Stat. Ann. § 60-258a(c)).[8] A defendant maintains this right whether those other participants "are joined as parties or are immune from liability." *Id.* Defendants assert that Mr. Ferrell negligently entrusted the Kia Optima to the decedent and that James Eric Ferrell thus shares in responsibility for the fatal accident. *See* Doc. 78 at 14 (Pretrial Order ¶ 4(b)(13)). Plaintiffs argue that Mr. Ferrell didn't have an exclusive or superior right of control over the Kia Optima. Doc. 80 at 5–8. Thus, their motion asks for summary judgment

---

[7]    The parties agree that Kansas law governs this action. Doc. 78 at 2 (Pretrial Order ¶ 1(d)). In diversity cases like this one, the court "applies the forum state's choice-of-law rules to determine which state's substantive law governs a claim." *Nordwald v. Brightlink Commc'ns, LLC*, 603 F. Supp. 3d 1030, 1040 (D. Kan. 2022) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). For tort claims, Kansas "courts apply the substantive law of the state where . . . the injury was sustained." *Dragon v. Vanguard Indus., Inc.*, 89 P.3d 908, 914 (Kan. 2004); *Nordwald*, 603 F. Supp. 3d at 1040. Here, the "injury was sustained" in Kansas, so Kansas substantive law governs. *Dragon*, 89 P.3d at 914.

[8]    Tenth Circuit interpretations of state law bind this court. *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010) ("When a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit." (quotation cleaned up)).

against defendant's contributory-negligence defense based on Mr. Ferrell negligently entrusting the decedent with the Kia Optima.

A genuine issue of material fact exists whether Mr. Ferrell could have prevented the decedent from driving the Kia Optima. Recall that Mr. Ferrell initially testified that he was the exclusive owner listed on the Kia Optima's title. Doc. 86-1 at 6 (Ferrell Dep. 40:21–41:18). And based on that assumption, he agreed that he could have precluded the decedent from driving the vehicle. *Id.* at 7 (Ferrell Dep. 42:6–10). Invoking his affidavit—where he changes course on both of these positions, Doc. 61-2 at 1–2 (Ferrell Aff. ¶¶ 10–12)—Mr. Ferrell asks for summary judgment because he didn't have a superior or exclusive right of control over the Kia Optima. Doc. 80 at 6–8. The court denies this motion. The record contains sufficient evidence for a rational jury to find or infer that Mr. Ferrell furnished the Kia Optima to the decedent.

*McCart v. Muir*, 641 P.2d 384 (Kan. 1982), is instructive. There, the Kansas Supreme Court rejected a defendant's sufficiency-of-the-evidence challenge after a jury had found him liable for negligently entrusting his son with a vehicle. *Id.* at 394. The court explained that defendant—the driver's father—was a "co-signer on the automobile finance papers" and "co-owner on the certificate of title[.]" *Id.* at 388. Thus, *McCart* concluded, defendant "was instrumental in furnishing the motor vehicle to his son[.]" *Id.* So too here. Mr. Ferrell helped his son acquire the vehicle by putting his name on the title to facilitate better financing. Doc. 61-2 at 1 (Ferrell Aff. ¶ 6). He also paid for the vehicle's insurance and, occasionally, he helped make the payments on the car. Doc. 86-1 at 8 (Ferrell Dep. 122:4–17). And Mr. Ferrell testified that he could take the keys away from his son.[9] Viewed in the light most favorable to

---

[9]      Recall that at his deposition, Mr. Ferrell agreed that he "could have at any time taken away the keys from [the decedent] and precluded him from driving that vehicle[.]" Doc. 86-1 at 7 (Ferrell Dep. 42:6–10). Then, in his affidavit, Mr. Ferrell changed positions and explained that he "could not have taken the keys away from [the decedent] or precluded him from driving that car." Doc. 61-2 at 2 (Ferrell

defendants, a rational jury could find or infer that Mr. Ferrell "was instrumental in furnishing the motor vehicle to his son[.]" *McCart*, 641 P.2d at 388.

Plaintiffs resist this outcome emphatically. They rely on *Snodgrass v. Baumgart*, 974 P.2d 604 (Kan. Ct. App. 1999), citing it no fewer than 17 times in their reply brief.[10] In *Snodgrass*, a husband and wife co-owned a vehicle involved in an accident. *Id.* at 606. The trial court found that the husband couldn't "as a matter of law, be held liable for negligently entrusting the co-owned car and granted summary judgment in his favor." *Id.* Affirming, the Kansas Court of Appeals distinguished *McCart*. *Id.* It explained that "*McCart* stressed the control that the father had over his son." *Id.* at 607. And, in *McCart*, "the father was 'instrumental in furnishing' the car to his son." *Id.* (quoting *McCart*, 641 P.2d at 388). That "essential control factor" was missing in *Snodgrass* because the husband and wife "shared an equal right to use and to possess the car[.]" *Id.*

---

Aff. ¶ 12). Admittedly, Mr. Ferrell premised his deposition testimony on his belief that only his name was on the vehicle's title. *See* Doc. 86-1 at 7 (Ferrell Dep. 42:6–10). And the vehicle title plainly lists both Mr. Ferrell and the decedent's names as owners. Doc. 61-1 at 1.

But whatever the explanation, Mr. Ferrell originally agreed that he could take the keys away from his son. Doc. 86-1 at 7 (Ferrell Dep. 42:6–10). Because the record contains conflicting admissible evidence, the factfinder must resolve this conflict. *See Thunder Basin Coal Co. v. Sw. Pub. Serv. Co.*, 104 F.3d 1205, 1212 (10th Cir. 1997) ("The jury has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact." (quotation cleaned up)). Also, even omitting this testimony, a reasonable factfinder could conclude—based on his name appearing on the title, his aid in financing the car, and his purchase of auto insurance—that Mr. Ferrell "was instrumental in furnishing the motor vehicle to his son[.]" *McCart*, 641 P.2d at 388.

[10]    While not binding on this court, decisions by the Kansas Court of Appeals are persuasive authority predicting how the Kansas Supreme Court would resolve issues of Kansas law. *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007) ("The decision of an intermediate appellate state court 'is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940))).

*Snodgrass* doesn't supply the silver bullet that plaintiffs imagine it does. This case isn't like *Snodgrass*, where co-ownership was the only basis for inferring a superior right of access. Here, Mr. Ferrell—like the father in *McCart*—helped finance the car and was a "co-owner on the certificate of title[.]" *McCart*, 641 P.2d at 388. Plus, Mr. Ferrell paid for the insurance on the vehicle and testified that he could take the keys away from his son. Plaintiffs aren't entitled to summary judgment. A jury reasonably could find or infer that Mr. Ferrell had a superior right of access to the Kia Optima and could have prevented his son from driving by—for instance—refusing to pay for auto insurance or make payments on the vehicle. The court thus denies plaintiffs' Motion for Partial Summary Judgment (Doc. 79).

Next, the court addresses defendants' Motion for Partial Summary Judgment (Doc. 82) and plaintiffs' contrary arguments.

## IV.        Defendants' Motion for Partial Summary Judgment (Doc. 82)

Defendants' Motion for Partial Summary Judgment (Doc. 82) asks the court to decide three issues.[11] *First*, defendants argue that Mr. Ferrell isn't a viable plaintiff for his wrongful-death claim. *Second*, defendants contend that Mr. Borbolla-Fierro was exempt from several provisions of the Federal Motor Carrier Safety Regulations and that plaintiffs thus can't use these regulations to support a negligence-per-se theory. And *third*, defendants seek summary judgment against both the respondeat-superior claim and negligent-entrustment claim that plaintiffs bring against Mr. Beauchamp. The court takes up these issues, below, starting with the wrongful-death arguments.

---

[11]     Plaintiffs' Response to this motion is 44 pages—four pages over the limit our local rules establish. Doc. 88; D. Kan. Rule 7.1(d)(2) ("Principal briefs in support of, or in response to, summary judgment . . . motions must not exceed 40 pages[.]"). In the interest of efficiency, the court considers the entirety of plaintiffs' filing. But the court cautions plaintiffs that they—like all litigants—must abide our court's rules. Rules aren't suggestions. They're rules.

### A.    Wrongful-Death Claim

Defendants first argue that plaintiff Mr. Ferrell's wrongful-death claim isn't viable.  Doc.

83 at 9–12.  They explain that Kansas law only permits heirs—not the decedent's estate or

anyone else, for that matter—to pursue claims for wrongful death.  *Id.*  The court agrees.  And as

it turns out, this conclusion creates a bit of a procedural conundrum.

The court first addresses defendants' real-party-in-interest challenge.  It then decides

whether to allow substitution.  Consulting Rules 16 and 17 of the Federal Rules of Civil

Procedure, the court permits joinder of the decedent's minor heir, S.F., in this action.  Finally,

the court takes up the issue of who should represent S.F.

#### 1.    Real Party in Interest

"A survival action may be brought only by the estate administrator pursuant to Kan. Stat.

Ann. § 60–1901, and only for the purpose of recovering damages suffered by the decedent prior

to death."  *Tank v. Chronister*, 160 F.3d 597, 599 (10th Cir. 1998).  "In contrast, a wrongful

death action may be brought only by the decedent's heirs-at-law pursuant to Kan. Stat. Ann.

§ 60–1902, and only for their 'exclusive benefit' for damages suffered by them as a result of the

wrongful death."  *Id.*  A wrongful-death "action may be brought only by an heir of the decedent

'who has sustained loss by reason of the death.'"  *Davidson v. Denning*, 914 P.2d 936, 942 (Kan.

1996) (quoting Kan. Stat. Ann. § 60-1902).  "The claim for wrongful death is brought neither on

behalf or for the benefit of the estate, but only on behalf and for the benefit of the heirs."  *Tank*,

160 F.3d at 599.  So, the decedent's estate can't bring a wrongful-death claim.  The next issue,

then, is determining who are the decedent's "heirs at law[.]"  Kan. Stat. Ann. § 60-1902.

The decedent's sole heir at law is his minor daughter, S.F.  The parties agree that the

decedent was unmarried, had a minor daughter, and died intestate.  Doc. 78 at 2–3 (Pretrial Order

Stipulations ¶ 2(a)(6), (7), (9)).  "As used in the wrongful death statutes, the terms 'heir' and

'heir at law' are interchangeable and refer to 'one who takes by intestate succession under the Kansas statutes.'" *Baugh v. Baugh ex rel. Smith*, 973 P.2d 202, 205 (Kan. Ct. App. 1999) (quoting *Johnson v. McArthur*, 596 P.2d 148, 153 (Kan. 1979)). Kansas law dictates that if "the decedent leaves a child . . . and no spouse, all his or her property shall pass to the surviving child[.]" Kan. Stat. Ann. § 59-506. Thus, S.F. is the decedent's sole heir at law. *See Baugh*, 973 P.2d at 205–06 (concluding that the child of an unmarried decedent was the decedent's sole heir at law).

S.F. thus is the only party who can bring a wrongful-death claim based on Jacob William Ferrell's death. And relatedly, the court agrees with defendants: Neither the decedent's mother, father, nor fiancé can pursue damages for the purported wrongful death. *See* Doc. 83 at 9 (arguing that plaintiffs' $50 million wrongful-death damages include "damages alleged to have been incurred by [the decedent's] fiancé, his mother, . . . , and his father"); Doc. 83-7 at 12 (Def. Ex. G) (including damages based on decedent's "[a]bility to provide family support" for his mother, father, and fiancé).

Plaintiffs contend that plaintiff Mr. Ferrell filed this action on behalf of S.F., as her next friend. Doc. 88 at 17. But the caption in the Pretrial Order doesn't support that assertion—at least not clearly. *See* Doc. 78 at 1. The caption says that Mr. Ferrell brings this case individually "and on behalf of the heirs of" the decedent. *Id.* Because the court now has determined that S.F. is the real party in interest for the wrongful-death claim, plaintiffs must join her to pursue that claim. *See* Fed. R. Civ. P. 17(a)(1) (explaining that "action must be prosecuted in the name of the real party in interest" and that a handful of representatives—none of which is a next friend— needn't join "the person for whose benefit the action is brought"); *Helminski v. Ayerst Lab'ys*, 766 F.2d 208, 213 (6th Cir. 1985) ("[T]he minor is the real party in interest in a suit brought by a

next friend."); *Morgan v. Potter*, 157 U.S. 195, 198 (1895) ("It is the infant, and not the next friend, who is the real and proper party. The next friend, by whom the suit is brought on behalf of the infant, is neither technically nor substantially the party, but resembles an attorney, or a guardian ad litem, by whom a suit is brought or defended in behalf of another. The suit must be brought in the name of the infant, and not in that of the next friend."). The court takes up this substitution issue, next.

### 2. Substitution

Because the Pretrial Order doesn't include the real party in interest—S.F.—the court now decides whether to allow her substitution into the action. "Rule 17(a) requires the district court to grant leave to substitute or join the real party in interest prior to dismissing an action for failure to name the real party in interest[.]" *Esposito v. United States*, 368 F.3d 1271, 1274 (10th Cir. 2004). This rule "'is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made.'" *Id.* at 1276 (emphasis omitted) (quoting Fed. R. Civ. P. 17 advisory committee's note to 1966 amendment). The Tenth Circuit "has never required a plaintiff seeking substitution to show that his mistake was 'understandable' in addition to being 'honest.'" *Id.* Instead, Circuit law "focus[es] primarily on whether the plaintiff engaged in deliberate tactical maneuvering (i.e., whether his mistake was 'honest'), and on whether the defendant was prejudiced thereby." *Id.* In fact, "even a mistake that should have been patently obvious does not automatically foreclose a later substitution, so long as the plaintiff did not act in bad faith and the defendant has not been prejudiced thereby." *Id.* (citing *Metro. Paving Co. v. Int'l Union of Operating Eng'rs*, 439 F.2d 300, 306 (10th Cir. 1971)). Whether to allow joinder of S.F. is a matter within the court's discretion. *See Scheufler v. Gen. Host Corp.*, 126 F.3d 1261, 1270 (10th Cir. 1997) ("In reviewing a district court's

decision to allow joinder of a real party in interest under Rule 17, we apply an abuse of discretion standard.").

Defendants argue that the court shouldn't permit a Rule 17 substitution. Doc. 90 at 9–10. They argue that plaintiffs have engaged in "deliberate tactical maneuvering" trying to recover damages "that are unrecoverable under Kansas law." *Id.* at 10. The court isn't persuaded. To be sure, it's not clear why plaintiffs and their counsel thought plaintiffs could recover for a wrongful-death claim, especially given the clear and binding law on the issue. *See Tank*, 160 F.3d at 599. But the Tenth Circuit has declined to read an "understandability" requirement into Rule 17(a). *Esposito*, 368 F.3d at 1275–77. Instead, the inquiry turns on whether the plaintiffs acted in bad faith and whether a substitution would prejudice the defendants. *Id.* at 1276. And defendants have failed to adduce any evidence or argument that plaintiffs' failure was some sort of "deliberate tactical maneuvering[.]" *Esposito*, 368 F.3d at 1274.

Nor have defendants persuaded the court that they have suffered prejudice. "A defendant must show 'tangible' prejudice from changing the named plaintiff." *Williams v. Am. Family Mut. Ins. Co.*, No. 19-cv-02694-REB-NRN, 2021 WL 1192947, at *3 (D. Colo. Mar. 30, 2021); *see also Scheufler*, 126 F.3d at 1270 (allowing Rule 17 substitution where defendant "made no tangible showing" that it would suffer prejudice). "Normally, the prejudice contemplated in allowing a third party to ratify the commencement and continuation of a lawsuit involves being unable to conduct discovery on possible defenses and not knowing the relevant parties in the action and what the critical issues would be." *Boscoe Chung v. Lamb*, No. 14-cv-03244-WYD-KLM, 2018 WL 6429922, at *8 (D. Colo. Nov. 14, 2018). But plainly, defendants had notice that S.F. is decedent's heir and that Mr. Ferrell intended to bring claims on behalf of the decedent's heirs. *E.g.*, Doc. 1 at 1 (Compl.) (listing plaintiff as "James Eric Ferrell, individually

and on behalf of the heirs of Jacob William Ferrell"); Doc. 78 at 2 (Pretrial Order Stipulations ¶ 2(a)(6)) (identifying S.F. as the decedent's minor daughter). So it's difficult to conceive any prejudice defendants would sustain by joining S.F. as plaintiff. *See Scheufler*, 126 F.3d at 1270 ("[T]he record suggests defendant[s] [were] well aware of the relevant parties in this action and what the critical issues would be, and thus should not have been surprised by the joinder."); *see also Garcia v. Hall*, 624 F.2d 150, 151 n.3 (10th Cir. 1980) ("The defendants would not be prejudiced in their defense of this action by changing the named plaintiff. They knew the persons and the issues involved before the statute of limitations ran.").

Defendants argue that they suffered prejudice because they have had to defend against fruitless claims and file a dispositive motion. Doc. 90 at 10. That explanation isn't compelling. Filing—and winning—dispositive motions is part and parcel of defending lawsuits. And it isn't the sort of prejudice that can prevent a Rule 17 substitution. *See Boscoe Chung*, 2018 WL 6439922, at *8 (explaining that prejudice for Rule 17 typically "involves being unable to conduct discovery on possible defenses and not knowing the relevant parties in the action and what the critical issues would be").

Plus, the "main thrust" of Rule 17 is "to allow a correction in parties after the statute of limitations has run, despite the valid objection that the original action was not brought by the real party in interest." *Garcia*, 624 F.2d at 151 n.3. That's precisely the situation here. The statute of limitations for S.F. to initiate a new action has expired. *See* Kan. Stat. Ann. § 60-513(a)(5) (setting statute of limitations for a wrongful-death action as two years); Doc. 78 at 2 (Pretrial Order Stipulations ¶ 2(a)(4)) (decedent died from his injuries on May 17, 2023). So if the court dismisses without granting S.F. leave to substitute, her wrongful-death claims will extinguish. In its discretion, the court declines to take that course—one unrelated to the case's merits. S.F.

"should not be punished for failure to offer to change parties before the court's ruling." *Garcia*, 624 F.2d at 151 n.3. The court concludes that Rule 17 counsels in favor of allowing S.F. to join this action.

The court now decides whether Rule 16—the rule governing Pretrial Orders—permits the same conclusion.

### 3. Amending the Pretrial Order

Plaintiffs seek leave to amend the Complaint to list S.F. as a plaintiff in this case. Doc. 88 at 18 (requesting leave to list as a plaintiff "S.F., a minor and sole heir of Jacob William Ferrell, by and through her natural grandfather and next friend, James Eric Ferrell"). But the Pretrial Order superseded the Complaint. *See Burke v. Regalado*, 935 F.3d 960, 1041 (10th Cir. 2019) ("When an issue is set forth in a pretrial order, it is not necessary to amend previously filed pleadings . . . . [The pretrial order] supersedes the pleadings and controls the subsequent course of litigation." (quotation cleaned up)). So, the court construes plaintiffs' request to amend the Complaint as one to amend the Pretrial Order.

"The court may modify" the Pretrial Order "only to prevent manifest injustice." Fed. R. Civ. P. 16(e). This standard "isn't meant to preclude any flexibility[.]" *Monfore v. Phillips*, 778 F.3d 849, 851 (10th Cir. 2015) ("Even that standard isn't meant to preclude any flexibility—trials are high human dramas; surprises always emerge; and no judge worth his salt can forget or fail to sympathize with the challenges the trial lawyer confronts. For all our extensive pretrial procedures, even the most meticulous trial plan today probably remains no more reliable a guide than the script in a high school play—provisional at best and with surprising deviations guaranteed."). Relevant factors for deciding whether to allow a party to amend a pretrial order include: "(1) prejudice or surprise to the party opposing trial of the issue; (2) the ability of that party to cure any prejudice; (3) disruption to the orderly and efficient trial of the case by

17

inclusion of the new issue; and (4) bad faith by the party seeking to modify the order." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1222 (10th Cir. 2000).

All of these factors favor permitting amendment. As already explained in the Rule 17 context, defendants haven't identified any persuasive reasons why they would suffer prejudice from this amendment. Nor is there any evidence in this record that plaintiffs have acted in bad faith. And disrupting trial preparation and efficient management of this trial is unlikely because including S.F. in this case won't change the legal theories of the causes of action or defenses. Coupled with Rule 17's concern with forfeiture and injustice, the *Koch* factors favor amending the Pretrial Order. *See Newton v. City of Atchison*, No. 23-2153-JWB, 2024 WL 5089992, at *3 (D. Kan. Dec. 12, 2024) (amending pretrial order to reflect real party in interest).[12] The court thus grants plaintiffs' request to substitute S.F. as a plaintiff and removes Mr. Ferrell, individually and on behalf of the decedent's heirs, as a plaintiff. *See* Doc. 88 at 18.[13]

---

[12]    *Koch* also instructs that "whether the party favoring amendment of the pretrial order formally and timely moved for such modification" is a relevant factor for assessing whether amendment of a pretrial order is proper. 203 F.3d at 1223. Plaintiffs made no such formal motion here. And plaintiffs' haphazard approach to this real-party-in-interest issue gives the court some pause. Still, the purpose of Rule 17—avoiding forfeiture—and the absence of meaningful prejudice to defendants persuade the court that amending the Pretrial Order here serves the interests of justice.

[13]    Unlike the original Pretrial Order, *see* Doc. 78 at 1, the amended version plaintiffs have requested omits James Eric Ferrell, individually, as a plaintiff. The original Pretrial Order didn't make clear which claims James Eric Ferrell intended to assert (or even could assert) on his own behalf. Regardless, the court grants plaintiffs' request to alter the case caption, which now omits James Eric Ferrell, individually, as a plaintiff in this case.

Removing Mr. Ferrell, individually, as a plaintiff presents another wrinkle. Defendants have raised a contributory-negligence defense, which accuses Mr. Ferrell of negligently entrusting the decedent with a car. Doc. 78 at 14 (Pretrial Order ¶ 4(b)(13)). But the Kansas statute governing contributory fault requires joinder of "any person whose causal negligence is claimed to have contributed to the death[.]" Kan. Stat. Ann. § 60-258a(c). Fortunately, the Tenth Circuit has determined that this statute "is procedural, is not outcome determinative, and is not binding on the federal courts." *Hefley*, 713 F.2d at 1497; *see also id.* at 1497 n.3 (collecting cases reaching same conclusion). Thus, defendants may continue to assert their contributory-negligence defense comparing Mr. Ferrell's alleged negligence, even after he exits the case as a plaintiff.

The next issue is who should serve as S.F.'s representative. The court takes up this issue, next.

### 4. S.F.'s Representative

Courts have a "general duty . . . to protect the interests of infants and incompetents[.]" *Garrick v. Weaver*, 888 F.2d 687, 693 (10th Cir. 1989). The court thus must determine who should represent S.F.—a minor, who is incompetent to represent herself in this matter. Plaintiffs argue that Mr. Ferrell—S.F.'s grandfather—should serve as S.F.'s next friend. Doc. 88 at 17–18. Defendants argue that the court should appoint a guardian ad litem to represent S.F. Doc. 90 at 10. The court sides with defendants. The court identifies Dave Rebein of Rebein Brothers PA as an attorney capable of serving as S.F.'s guardian ad litem. The court explains this conclusion, next.

A next friend is not a party—instead, a next friend "simply pursues the cause on behalf of" the incompetent person, "who remains the real party in interest." *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990). A "next friend" must meet two requirements. First, a "next friend" must provide "an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action." *Id.* (citations omitted). "Second, the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate[.]" *Id.* (citation omitted). The court hesitates to appoint Mr. Ferrell as S.F.'s next friend in light of this second requirement.

Case law dictates that when a conflict arises between a representative and a minor, the court should appoint a guardian ad litem to represent the minor's interests. *Garrick*, 888 F.2d at 693 ("When the court determines that the interests of the infant and the infant's legal representative diverge, appointment of a guardian ad litem is appropriate."); *see also Am. Guarantee & Liability Ins. Co. v. ACE Am. Ins. Co.*, 990 F.3d 842, 848 (5th Cir. 2021)

(explaining that—under Texas law—when a next friend develops an adverse interest, "the next friend is no longer competent to represent the minor" (quotation cleaned up)); *Hoffert v. Gen. Motors Corp.*, 656 F.2d 161, 164 (5th Cir. 1981) ("[C]ourts have consistently recognized that they have inherent power to appoint a guardian ad litem when it appears that the minor's general representative has interests which may conflict with those of the person he is supposed to represent."). According to defendants, Mr. Ferrell has demonstrated that he's adverse to S.F.'s interests by pursuing wrongful-death damages on his own behalf. Doc. 90 at 10. Thus, defendants argue, the court should appoint a guardian ad litem for S.F. *Id.* The court isn't convinced by that particular conflict-of-interest argument.

But the court is concerned that S.F. might have interests adverse to Mr. Ferrell. Defendants have raised a defense based on Mr. Ferrell's purported contributory negligence. Doc. 78 at 14 (Pretrial Order ¶ 4(b)(13)). And the court already has concluded that plaintiffs aren't entitled to summary judgment against that defense. *See above* § III. That Mr. Ferrell plausibly contributed to the decedent's death suggests that S.F. might have a claim against him. That's because "a first-party negligent entrustment claim is a viable claim under Kansas law." *Martell v. Driscoll*, 302 P.3d 375, 382 (Kan. 2013). Kansas law "clearly imposes a duty upon an entrustor not to supply a chattel to an entrustee whom the entrustor knows or should know is likely to misuse the chattel in a manner causing unreasonable risk of harm to the entrustee and/or others." *Id.* at 387. This potential conflict suggests that an undeniably disinterested representative—one other than Mr. Ferrell—should determine whether S.F. has a viable claim to assert against Mr. Ferrell. *See Williams v. City of Flint*, No. 06-10427, 2008 WL 220626, at *1 (E.D. Mich. Jan. 25, 2008) ("[C]ourts recognize their inherent power to appoint a guardian ad litem when it appears the minor's general representative has interests that may conflict with the

minor's interests."). And even if this potential claim isn't a slam dunk, or litigation tactics caution against prosecuting such a claim, an independent and fully informed advocate should evaluate the situation and make that decision on S.F.'s behalf.

The parties' papers don't address, however, who should serve as S.F.'s guardian ad litem. Given the quickly approaching trial in November, the court must process this issue rapidly. The court's plan for accomplishing this goal consists of two compressed stages.

The first stage consists of the court's suggestion for this role. The court suggests David Rebein of Rebein Brothers PA, a firm based in Dodge City, Kansas. Mr. Rebein is a member of the American College of Trial Lawyers, is experienced in accident claims and trials, and practices regularly in our court. But the parties to a case almost always know things about a case that the court does not. So, the second stage recognizes that possibility. It consists of the court providing the parties with time to object to Mr. Rebein. **If either end of the caption believes it's inappropriate for Mr. Rebein to serve as S.F.'s guardian ad litem, it must submit a written objection explaining the reasons for its opposition. A party must file such objection within seven days after the date when this Order issues.**

To summarize, the court agrees with defendants that Mr. Ferrell can't bring a wrongful-death claim under Kansas law. Under our Circuit's lenient approach to Rule 17 substitutions, the court amends the Pretrial Order to include S.F. as a plaintiff and to remove Mr. Ferrell, individually and on behalf of the decedent's heirs, as a plaintiff. Mr. Ferrell remains a party to this case as the administrator of the decedent's estate. Finally, because S.F. may have interests that might conflict with Mr. Ferrell's, the court denies plaintiffs' request to permit Mr. Ferrell to serve as S.F.'s next friend.

In the following section of this Order, the court addresses defendants' summary judgment arguments about the Federal Motor Carrier Safety Regulations.

### B.    Federal Motor Carrier Safety Regulations

Defendants next move for summary judgment against parts of plaintiffs' negligence-per-se claim. Doc. 83 at 12–13. Plaintiffs allege that KB Custom "violated various federal motor carrier safety regulations, Kansas statutes, and Kansas Administrative [R]egulations as listed in the Complaint and in Roger Allen's report." Doc. 78 at 5 (Pretrial Order ¶ 3(a)). Defendants contend that the Federal Motor Carrier Safety Regulations (FMCSRs) exempt some operations from certain provisions and that two of these exemptions apply here: one based on custom-harvesting operations and one based on a 150-mile rule. *Id.* The court addresses each of these arguments, below.[14]

### 1. Custom-Harvesting Operations

One of the Federal Motor Carrier Safety Regulations exempts drivers "engaged in custom-harvesting operations" from the requirements of § 391. 49 C.F.R. § 391.2(a). The full text of the exemption reads:

> Farm custom operation. The rules in this part, except for § 391.15(e) and (f), do not apply to a driver who drives a commercial motor vehicle controlled and operated by a person engaged in custom-harvesting operations, if the commercial motor vehicle is used to—(1) Transport farm machinery, supplies, or both, to or

---

[14]    Defendants' principal brief suggests that plaintiffs can't maintain a cause of action based on a violation of the FMCSRs. *See* Doc. 83 at 12 ("Plaintiffs are prohibited from maintaining a private cause of action for alleged violations of the Motor Carrier Act or the FMCSRs."). But defendants never argue that plaintiffs can't pursue a negligence-per-se theory based on a violation of the FMCSRs. *See generally id.* And defendants' Reply makes clear that they seek summary judgment solely on the exemptions they've raised. *See* Doc. 90 at 11 ("Defendants' motion narrowly sought partial summary judgment on plaintiffs' claim that it could establish negligence based on Part 391 . . . and Part 395 of the FMCSRs because KB Custom and Borbolla-Fierro were exempt from those parts. . . . plaintiffs cannot rely on regulations that KB Custom is exempt from in its attempt to establish negligence.") The court thus declines to consider whether Kansas law permits a plaintiff to utilize violations of federal regulations to support a negligence-per-se claim under Kan. Stat. Ann. § 66-176.

> from a farm for custom-harvesting operations on a farm; or (2) Transport custom-harvested crops to storage or market.

*Id.* Defendants argue that this exemption applies to Mr. Borbolla-Fierro and ask the court to rule that plaintiffs thus can't wield provisions from § 391 to prove negligence per se. Doc. 83 at 12. The court grants this request.

The FMCSRs don't define "custom-harvesting operations." The court interprets the term to include operations that involve supplying "equipment and labor to assist farmers with harvesting" on a contractual basis. Commercial Driver's License (CDL): Application for Exemption; U.S. Custom Harvesters, Inc. (USCHI), 83 Fed. Reg. 49977, 49977 (Oct. 3, 2018); *see also* R.W. Steffen, et al., *Concerns of Custom Harvesters*, 13 J. of Ag. Safety & Health 349, 349 (2007) ("The Association of Canadian Custom Harvesters, Inc. . . . defines a custom harvester as a professional who harvests a variety of crops, on a contract basis, for other farmers throughout the North American grain belt."). The uncontroverted facts in the summary judgment record establish that KB Custom satisfies this definition. KB Custom received contracts from dairies and feedlots to harvest silage. Doc. 83-1 at 6 (Beauchamp Dep. 323:5–9). And Mr. Borbolla-Fierro was transporting harvested wheat to storage or market at the time of the accident. *Id.* at 9 (Beauchamp Dep. 326:1–11). The court thus holds that Mr. Borbolla-Fierro and KB Custom were "engaged in custom-harvesting operations" within the meaning of 49 C.F.R. § 391.2(a). On this record, no reasonable jury could conclude otherwise. Mr. Beauchamp and KB Custom thus were exempt from the provisions of § 391. And the court grants summary judgment against any negligence-per-se theory based on violations of § 391.[15]

---

[15]    The relevant exemption doesn't apply to § 391.15(e) and (f). 49 C.F.R. § 391.2(a). But plaintiffs don't allege a violation of either of these subsections. *See generally* Doc. 1 (Compl.); Doc. 78 (Pretrial Order); Doc. 85-3 (Allen Expert Report).

Plaintiffs' contrary argument is difficult to follow. Doc. 88 at 26–30. Here's the court's understanding of plaintiffs' position: KB Custom hired Mr. Borbolla-Fierro as an H-2A worker. *Id.* at 27. So, KB Custom was required to comply with H-2A regulations. *Id.* One of those regulations limits eligibility for the program to those engaged in "agricultural labor or services." *Id.* at 27–28. And, plaintiffs contend, the term "agricultural labor or services" includes "custom combining," a phrase which excludes harvesting silage. *Id.* at 28–29. Thus, plaintiffs conclude that defendants either are in compliance with H-2A regulations and not exempt from § 391, or alternatively, defendants are violating H-2A regulations.

The court isn't persuaded and declines to interpret these H-2A regulations as plaintiffs suggest. That's because whether defendants are violating H-2A regulations is immaterial to any of the claims or defenses advanced in this case. *See Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1094 (10th Cir. 2010) ("Judicial restraint, after all, usually means answering only the questions we must, not those we can."). And how the United States Citizenship and Immigration Services defines "custom combining" says nothing about how the Federal Motor Carrier Safety Administration uses the distinct term "custom-harvesting operations." *Compare* 20 C.F.R. § 655.301 (defining "custom combining"), *with* 49 C.F.R. § 391.2(a) (discussing "custom-harvesting operations"). In short, plaintiffs' immigration-regulation argument doesn't persuade the court that KB Custom and Mr. Borbolla-Fierro weren't "engaged in custom-harvesting operations" within the meaning of 49 C.F.R. § 391.2(a).

Thus, the court concludes, Mr. Borbolla-Fierro was "engaged in custom-harvesting operations" because he was using the 2015 Kenworth to transport "customer-harvested crops to storage or market." *Id.* § 391.2(a)(2). No reasonable trier of fact could conclude otherwise. The

court grants summary judgment against any theory of negligence per se predicated on defendants violating § 391 of the FMCSRs.

### 2.  150 Mile Rule

Another of the Federal Motor Carrier Safety Regulations exempts from other provisions of § 395 those "drivers transporting . . . [a]gricultural commodities from the source of the agricultural commodities to a location within a 150 air-mile radius from the source[.]"  49 C.F.R. § 395(k)(1).  Defendants ask the court to grant summary judgment on this exemption as well. Doc. 83 at 13.  In other words, defendants ask the court to determine that this exemption applies as a matter of law so that plaintiffs can't use § 395 to support a negligence-per-se theory.  The court grants this request as well.

KB Custom's drivers transport harvest silage from fields to dairies and feedlots within 150 miles of the truck-loading location.  Doc. 83-1 at 6–7 (Beauchamp Dep. 323:23–324:9). Plaintiffs argue that they have controverted this fact.  Doc. 88 at 30.  Not so.  As the court already has discussed, *see above* note 4, plaintiffs' myriad points—largely involving the great distances that KB Custom's employees drive generally—are neither here nor there.  Plaintiffs have failed to cite record evidence that contradicts the narrow fact asserted here.  KB Custom's drivers—including Mr. Borbolla-Fierro—transport "[a]gricultural commodities from the source of the agricultural commodities to a location within a 150 air-mile radius from the source[.]"  49 C.F.R. § 395(k)(1).  KB Custom's drivers thus aren't subject to the provisions of § 395 of the FMCSRs.  The court grants summary judgment against any negligence-per-se theory that depends on proving a violation of § 395.

To summarize, the court agrees with defendants that multiple exemptions from the FMCSRs apply here.  It thus grants summary judgment against any negligence-per-se claim based on violations of § 391 or § 395 of the FMCSRs.  With those conclusions, the court now

pivots to address defendants' summary judgment arguments about claims asserted against Mr.
Beauchamp.

### C.     Claims Against Mr. Beauchamp

Plaintiffs pursue two claims against Mr. Beauchamp:  one based on respondeat superior
and a second based on negligent entrustment.  Doc. 78 at 11 (Pretrial Order ¶ 4(a)(i), (iv)).  Mr.
Beauchamp asserts that he deserves summary judgment against both of these claims.  Doc. 83 at
13–17.  The court tackles them both, starting with respondeat superior.

### 1.     Respondeat Superior

Recall that Mr. Beauchamp is the sole owner of KB Custom.  Doc. 83-1 at 2, 5
(Beauchamp Dep. 11:10–11; 259:2–4).  Mr. Beauchamp argues that plaintiffs can't hold him
liable under a theory of respondeat superior.  Doc. 83 at 13–15.  He contends that KB Custom—
not Mr. Beauchamp—was Mr. Borbolla-Fierro's employer.  *Id.* at 14.  Thus, he says, plaintiffs
can't wield respondeat superior against him.  *Id.*  In response, plaintiffs emphasize that Mr.
Beauchamp exercised control and responsibility over Mr. Borbolla-Fierro.  Mr. Beauchamp has
the better of this dispute.  As shown below, Kansas law doesn't impose liability on a supervisor,
officer, or owner of a corporation based on respondeat superior.

Kansas law recognizes respondeat superior—or imputed negligence—in two situations:
"master/servant (employer/employee) and joint enterprise relationships."  *Brillhart v. Scheier*,
758 P.2d 219, 221 (Kan. 1988); *see also Schmidt v. Martin*, 510 P.2d 1244, 1249 (Kan. 1973)
("We hold that in the absence of statute in order to impute the negligence of one person to
another, the relation between them must be one invoking the principles of agency or the persons
must be co-operating in common or joint enterprise, so that the person to whom negligence is
imputed has a legal right to control the acts of the person actually negligent.").  Neither of these

theories furnishes an adequate basis here to impose vicarious liability on Mr. Beauchamp. Take them in turn.

### a.    Master/Servant

Mr. Beauchamp isn't liable under a master/servant relationship because KB Custom Ag Services LLC, not Mr. Beauchamp, employed Mr. Borbolla-Fierro. Doc. 78 at 2 (Pretrial Order Stipulations ¶ 2(a)(5)) ("Isidro Borbolla-Fierro was employed by KB Custom Ag Services LLC, and at the time of the May 12, 2023 collision was in the course and scope of his employment with KB Custom Ag Services LLC."). Though Kansas appellate courts haven't opined on this issue expressly, Kansas case law suggests that only an employer can incur respondeat-superior liability. *See, e.g.*, *Brillhart*, 758 P.2d at 221–22 (characterizing the master/servant relationship as an "employer/employee" relationship and quoting a treatise to justify imposing liability on an employer); *Sanchez ex rel. Sanchez v. Unified Sch. Dist. 469*, 339 P.3d 399, 407 (Kan. Ct. App. 2014) ("Under this doctrine [of respondeat superior], an *employer* may be held liable to a third person for injuries caused by the negligence of an employee if the employee is acting within the scope of employment." (emphasis added)); *Long v. Houser*, 456 P.3d 549, 552 (Kan. Ct. App. 2020) (explaining that "the justification for vicarious liability is that the losses caused by an employee's tortious or bad acts are placed on the *enterprise or the employer* engaged in that enterprise as a cost of doing business" (emphasis added)).

The weight of authority outside of Kansas supports this conclusion, too. *See Bertels v. Farm Bureau Prop. & Cas. Ins. Co.*, 123 F.4th 1068, 1078 (10th Cir. 2024) (explaining that federal courts may consult "the general weight and trend of authority" when predicting how a state's highest court would resolve an issue). Take, for instance, the Restatement (Third) of Agency. Its explanation confines liability under respondeat superior to employers. Restatement (Third) of Agency § 7.07(1) (A.L.I. 2006) ("An employer is subject to vicarious liability for a

tort committed by its employee acting within the scope of employment.").  Plus, the Restatement excludes supervisor-subordinate relationships—like the one between Mr. Beauchamp and Mr. Borbolla-Fierro—from vicarious liability.  It characterizes supervisors and subordinates as "[s]uperior and subordinate coagents."  *Id.* § 1.04(9).  And it explains that "neither agent is the other's agent" and "neither is vicariously liable for wrongs committed by the other."  *Id.* § 1.04 cmt. a.

The Supreme Court's decision in *Meyer v. Holley*, 537 U.S. 280 (2003), corroborates this approach.  There, the Court considered whether the Fair Housing Act "imposes liability without fault upon an officer or owner of a residential real estate corporation for the unlawful activity of the *corporation's* employee or agent."  *Id.* at 282 (emphasis in original).  *Meyer* answered no.  *Id.* at 285–91.  It observed that Congress "legislates against a legal backdrop of ordinary tort-related vicarious rules[.]"  *Id.* at 285.  Against that common-law backdrop, the Supreme Court explained that it "is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment."  *Id.*  And "it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents."  *Id.* at 286.

In sum, under agency common law, corporate entities—not their owners, officers, or supervisors—incur vicarious liability for the negligence of corporate employees.

Plaintiffs' counterargument isn't persuasive.  Plaintiffs contend that Mr. Beauchamp exercised responsibility and control over Mr. Borbolla-Fierro.  Doc. 88 at 35–36.  And so, they argue, they may hold Mr. Beauchamp liable under respondeat superior, too.  *Id.*  To support this

argument, plaintiffs direct the court to this passage from the Kansas Supreme Court's opinion in

*Brillhart*:

> "[Respondeat superior] is a 'fiction of the law,' not favored in this state, which is
> limited to master/servant (employer/employee) and joint enterprise relationships.
> These are relationships in which the potential respondents have sufficient control
> and responsibility for the actions of others to justify holding them liable for their
> actions."

Doc. 88 at 35 (emphasis and internal citations omitted) (quoting *Brillhart*, 758 P.2d at 221).  As

best the court can tell, plaintiffs' position is that the last line of this passage provides their

responsibility-and-control argument with teeth.  *See id.*  The court doesn't read *Brillhart*'s stray

line to extend respondeat-superior liability to anyone who exercises responsibility or control over

a tortfeasor.

For starters, *Brillhart* makes clear that respondeat superior isn't a favored doctrine under

Kansas law.  758 F.2d at 221; *see also Schmidt*, 510 P.2d at 1247 ("This court from an early date

has been highly critical of the doctrine of imputed negligence, pointing out that it is a fiction of

the law which finds small favor with the courts.").  So plaintiffs' arguments for expanding its

scope begins on shaky ground.

And the Kansas Supreme Court repeatedly has emphasized the agency relationship

necessary for vicarious liability.  *See, e.g.*, *Schmidt*, 510 P.2d at 1249 ("We hold that in the

absence of statute in order to impute the negligence of one person to another, the relation

between them must be one invoking the principles of agency or the persons must be co-operating

in a common or joint enterprise, so that the person to whom the negligence is imputed has a legal

right to control the acts of the person actually negligent."); *Hurla v. Capper Publ'ns*, 87 P.2d

552, 557 (Kan. 1939) (explaining that a party must "establish that particular species of agency

known as master and servant" to impose vicarious liability); *Atkinson v. Wichita Clinic, P.A.*,

763 P.2d 1085, 1086 (Kan. 1988) ("Under Kansas law, there is no distinction between the

liability of a principal for the torts of his agent and the liability of a master for the torts of his

servant."). But, an employee isn't the agent of his supervisor. Restatement (Third) of Agency

§ 1.01 cmt. g (A.L.I. 2006) ("An actor who acts under the immediate control of another person is

not that person's agent unless the actor has agreed to act on the person's behalf."). The

Restatement offers these examples:

> For example, a foreman or supervisor in charge of a crew of laborers exercises full
> and detailed control over the laborers' work activities. The relationship between
> the foreman and the laborers is not an agency relationship despite the foreman's
> full control, nor is their relationship one of subagency. . . . The foreman and the
> laborers are coagents of a common employer who occupy different strata within an
> organizational hierarchy. . . . The foreman's role of direction, defined by the
> organization, does not make the laborers the foreman's own agents. The laborers
> act on behalf of their common employer, not the foreman. Likewise, the captain of
> a ship and its crew are coagents, hierarchically stratified, who have consented to
> act on behalf of their common principal, the ship's owner.

*Id.* Based on this authority, the court rejects plaintiffs' argument. Mere exercise or control over

a subordinate doesn't render a supervisor vicariously liable for the subordinate's torts. Thus, Mr.

Beauchamp can't incur vicarious liability for Mr. Borbolla-Fierro's alleged negligence.

In theory, plaintiffs' control-and-responsibility arguments could support a common-law

negligence theory against Mr. Beauchamp, but they don't support a respondeat-superior theory.

*See Stroud v. Ozark Nat'l Life Ins. Co.*, 564 P.3d 725, 744 (Kan. 2025) ("Vicarious liability,

sometimes called imputed negligence or respondeat superior, generally applies to legal liability

which arises solely because of a relationship and not because of any actual act of negligence by

the person held vicariously liable for the act of another." (internal quotation marks and citation

omitted)). And plaintiffs have waived a common-law negligence theory against Mr. Beauchamp

by failing to include it in the Pretrial Order. Doc. 78 at 11 (Pretrial Order ¶ 4(a)(ii)) (asserting

"common law direct negligence" against KB Custom but not Mr. Beauchamp); *see also Zenith*

*Petrol. Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) ("'Claims, issues, defenses, or

theories of damages not included in the pretrial order are waived.'" (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006))).

Plaintiffs' joint-enterprise arguments fare no better, as the court explains, next.

### b.    Joint Enterprise

Separately, plaintiffs also argue that Mr. Beauchamp may incur vicarious liability through a joint-enterprise theory. Doc. 88 at 37. The court disagrees.

The Kansas Supreme Court has explained "that four basic elements are necessary to establish a joint venture so as to impose vicarious liability. They are: (1) An agreement; (2) a common purpose; (3) a community of interest; and (4) an equal right to a voice, accompanied by an equal right of control over the instrumentality (the automobile)." *Lightner v. Frank*, 727 P.2d 430, 433 (Kan. 1986).

This theory falls flat on this case's summary judgment facts. The Kansas Supreme Court consistently has held that owners of vehicles aren't automatically liable for negligence by a driver of their vehicle. *Schmidt*, 510 P.2d at 1247 (compiling cases). An owner of a vehicle incurs liability for the driver's negligence only if the driver is acting as the owner's agent. *E.g.*, *Halverson v. Blosser*, 168 P. 863, 863–64 (Kan. 1917) (explaining that liability "cannot result from ownership of an automobile" except "if at all, on the relation of master and servant or principal and agent" in which case the owner can incur liability "under the general principles governing the relation of master and servant or principal and agent"); *Zeeb v. Bahnmaier*, 176 P. 326, 327 (Kan. 1918) (explaining that owner of vehicle wasn't vicariously liable for automobile crash "[u]nless some rational theory of principal and agent, or of master and servant, supported by substantial evidence" connected the owner to the driver); *see also Lightner*, 727 P.2d at 434 ("[T]he only logical basis for the imputation of the negligence of one person to another is the

right of the latter to control the acts of the former.").  And, as the court already has explained, Mr. Borbolla-Fierro was acting as KB Custom's agent—not Mr. Beauchamp's agent.

Plaintiffs bank their argument on *Howard v. Zimmerman*.  Doc. 88 at 37–38 (citing *Howard v. Zimmerman*, 242 P. 131 (Kan. 1926)).  In *Howard*, two boys took "two girls automobile riding."  242 P. at 132.  The two boys took turns driving the car.  *Id.*  While one of the boys was driving and the other—the defendant—was sitting in the rear seat, the car collided with another vehicle, striking and killing a woman.  *Id.*  The jury found the defendant liable because he had "the right to control [the driver] as to the manner in which he would operate said car while the same was being driven by [the driver.]"  *Id.*  The Kansas Supreme Court affirmed. It explained in a joint enterprise, the "basis of liability of one associate . . . is equal privilege to control the method and means of accomplishing the common design."  *Id.*  And while "actual manipulation at the time injury was inflicted" isn't necessary, "equal authority to prescribe conditions of use" is.  *Id.*  *Howard* found those conditions satisfied.  *Id.*  Each boy had equal authority where the car went, who was driving it, and how fast the car was travelling.  *Id.*  So, a joint-enterprise theory of liability was viable.

That's not so here, however.  The record contains no evidence that Mr. Beauchamp had any authority—let alone equal authority—"to prescribe conditions, use, and operations of the car."  *Siruta v. Siruta*, 348 P.3d 549, 567 (Kan. 2015) (describing holding in *Howard*).  How could he?  He wasn't in the truck when the negligent operation of the truck occurred.  *See Lightner*, 727 P.2d at 433 ("There must be equal responsibility for the negligent operation of the vehicle, and there can be no equal responsibility unless there is equal privilege and right to direct and control its operation.").  True, *Howard* instructs that a defendant needn't have actual and active control of the instrumentality to face liability.  242 P. at 132.  But *Howard* is different

because the defendant was in the vehicle when the collision occurred and he had the ability to command the driver on his speed and manner of driving. *See id.* Here, in contrast, Mr. Beauchamp had no say about *how* Mr. Borbolla-Fierro drove the truck.

Plaintiffs emphasize the extent of supervisory control that Mr. Beauchamp had over Mr. Borbolla-Fierro. Doc. 88 at 35–36. They point out that Mr. Beauchamp:

- had control over which drivers returned each year;
- personally observed drivers;
- was responsible for managing and maintaining KB Custom's fleet of vehicles;
- was responsible for ensuring compliance with federal regulations; and
- was Mr. Borbolla-Fierro's superior.

*Id.* These points plausibly establish that Mr. Beauchamp supervised Mr. Borbolla-Fierro. But no reasonable factfinder could conclude from them that Mr. Beauchamp shared "equal responsibility for the negligent operation of the vehicle[.]" *Lightner*, 727 P.2d at 433. Mr. Beauchamp wasn't in the truck when the collision occurred. And there's no record evidence to support a theory that Mr. Beauchamp had any right to dictate how Mr. Borbolla-Fierro drove the truck. For example, the speed of the truck, the lane the truck used, and whether the truck slowed or stopped at a yield sign were all in Mr. Borbolla-Fierro's exclusive control. Mr. Beauchamp thus didn't share "equal responsibility for the negligent operation of the vehicle" and isn't vicariously liable for Mr. Borbolla-Fierro's negligent driving. *Lightner*, 727 P.2d at 433; *see also Howard*, 242 P. at 132 (requiring "equal control over [the] use" of an automobile to impute liability for collision to nondriver).

In sum, plaintiffs haven't identified any case law (from Kansas or elsewhere) to support their novel theory of joint-enterprise liability. Given the disfavored status of imputed liability in Kansas, *see Brillhart*, 758 P.2d at 221, the court declines to extend it to the situation here. Plaintiffs have raised no triable issue whether Mr. Beauchamp exercised "equal responsibility for

the negligent operation of the" truck. *Lightner*, 727 P.2d at 433. The court thus grants summary judgment to Mr. Beauchamp on both respondeat-superior theories.

But, as the court explains next, a rational jury could find Mr. Beauchamp liable for negligently entrusting Mr. Borbolla-Fierro with a tractor trailer.

### 2. Negligent Entrustment

A "negligent entrustment claim has four elements: (1) an entrustment of a chattel, (2) to an incompetent entrustee, (3) with knowledge or reason to know of the entrustee's incompetence and, (4) the entrustee's incompetence while using the chattel is the cause in fact of injury or damage to the entrustee and/or another." *Martell*, 302 P.3d at 382. In the context of vehicle sharing, "[n]egligent entrustment occurs when an owner of an automobile allows a third party to drive it while knowing the driver to be incompetent, careless, or reckless." *Marquis v. State Farm Fire & Cas. Co.*, 961 P.2d 1213, 1223 (Kan. 1998).

Mr. Beauchamp offers three summary judgment arguments against this claim. *First*, he argues, it's uncontroverted. He wasn't the owner of the 2015 Kenworth. Doc. 83 at 15. *Second*, he contends that it was someone else—a KB Custom employee—and not Mr. Beauchamp who furnished Mr. Borbolla-Fierro with the vehicle. *Id.* And *third*, there's no evidence that Mr. Borbolla-Fierro was an incompetent driver or that Mr. Beauchamp knew or should have known that Mr. Borbolla-Fierro was an incompetent driver. *Id.* at 16–17. The court disagrees on all three points.

### a. Ownership

On this summary judgment record, a reasonable jury could find Mr. Beauchamp owned the 2015 Kenworth trailer. Mr. Beauchamp argues that he wasn't the title owner of the 2015 Kenworth, citing his own deposition and the title document itself. Doc. 83 at 4, 15 (first citing Doc. 83-1 at 14 (Beauchamp Dep. 347:1–9); and then citing Doc. 83-3 (Def. Ex. C)). The

vehicle title shows an issue date of November 16, 2023, about six months after the collision.  It

thus adds little to the debate.  Regardless, record evidence contradicts Mr. Beauchamp's position.

An officer who prepared a crash report for the collision testified that Mr. Beauchamp was the

registered owner of the 2015 Kenworth.  Doc. 88-7 at 2 (Reed Dep. 7:11–20).  Because a rational

factfinder could credit the officer's testimony and conclude that Mr. Beauchamp owned the 2015

Kenworth trailer, genuine issues of material fact remain about this element.  And Mr.

Beauchamp isn't entitled to summary judgment on this basis.

### b.  Third-Party Furnishing

Nor is it dispositive that another employee assigned the 2015 Kenworth to Mr. Borbolla-

Fierro.  Section 390 of the Second Restatement—which the Kansas Supreme Court expressly has

adopted, *Martell*, 302 P.3d at 380—contemplates that a party may incur liability for causing

chattel to flow through a third party to an incompetent user.  *See* Restatement (Second) of Torts

§ 390 (A.L.I. 1965) (imposing liability on one "who supplies directly *or through a third person* a

chattel for the use of" an incompetent person (emphasis added)).  And here, the record contains

sufficient evidence for a reasonable jury to conclude that Mr. Beauchamp caused a third party to

supply the 2015 Kenworth to Mr. Borbolla-Fierro.  Assuming that Mr. Beauchamp owned the

2015 Kenworth, he allowed KB Custom to use it.  As CEO and owner, Mr. Beauchamp stood

atop the employee hierarchy at KB Custom.  He possessed ultimate authority over the company's

decisions.  Doc. 88-1 at 53 (Beauchamp Dep. 244:6–24).  He also chose which employees to

retain and which ones to fire.  *Id.* at 14 (Beauchamp Dep. 61:8–24).  Viewing this amalgamation

of facts in the light most favorable to plaintiffs, a reasonable juror could conclude that Mr.

Beauchamp caused a third party—one of KB Custom's employees—to furnish or supply the

2015 Kenworth to Mr. Borbolla-Fierro.[16]

### c.    Breach

Finally, a reasonable jury could find that Mr. Beauchamp had reason to know that Mr.

Borbolla-Fierro wasn't competent to drive the semitruck at the time that he did.  While it's a

close call, the court concludes that plaintiffs have presented a triable issue whether Mr.

Beauchamp had reason to know that Mr. Borbolla-Fierro wasn't competent to drive at the time of

the collision.

First things first:  the governing standard.  Plaintiffs argue that Mr. Beauchamp "should

have known" Mr. Borbolla-Fierro was incompetent.  Doc. 88 at 41.  But that's not the standard.

Instead, the standard is whether Mr. Beauchamp had "reason to know" about Mr. Borbolla-

Fierro's purported incompetence.  *Martell*, 302 P.3d at 382.  There's a difference.  The Second

Restatement explains that the "words 'reason to know' . . . denote the fact that the actor has

information from which a person of reasonable intelligence . . . would infer that the fact in

question exists[.]"  Restatement (Second) of Torts § 12(1) (A.L.I. 1965).  In contrast, the "words

'should know' . . . denote the fact that a person of reasonable prudence and intelligence . . .

would ascertain the fact in question in the performance of his duty[.]'"  *Id.* § 12(2).  The two

---

[16]    Mr. Beauchamp also abandoned both of these arguments—that he didn't own the truck and that he didn't furnish it to Mr. Borbolla-Fierro—by not addressing them in his reply brief.  *See generally* Doc. 90.  This abandonment furnishes an additional reason to reject these arguments as a basis for granting summary judgment against the negligent-entrustment claim.  *See BD Med. Supplies LLC v. Bluestem Mgmt. Advisors, LLC*, 685 F. Supp. 3d 1062, 1070 n.4 (D. Kan. 2023) ("Based on defendants' failure to address this argument in the Reply, the court can consider it abandoned."); *see also In re FCC 11-161*, 753 F.3d 1015, 1100–01 (10th Cir. 2014) (rejecting petitioners' argument because their reply brief was silent on an issue and made no attempt to rebut the respondents' argument); *Cayetano-Castillo v. Lynch*, 630 F. App'x 788, 794 (10th Cir. 2015) (holding that an appellant, who doesn't respond to an argument in its reply brief, "waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the appellee" because the court isn't "required to do his work for him and dissect the [appellee's] plausible argument" (quotation cleaned up)).

phrases thus "differ in that 'reason to know' implies no duty of knowledge on the part of the actor whereas 'should know' implies that the actor owes another the duty of ascertaining the fact in question." *Id.* § 12 cmt. a.

Relying on a 20-year-old Kansas Court of Appeals case, plaintiffs argue that the standard is whether Mr. Beauchamp knew or should have known that Mr. Borbolla-Fierro was an incompetent driver. Doc. 88 at 38 (citing *Grimmett v. Burke*, 906 P.2d 156 (Kan. Ct. App. 1995)). But *Grimmett* used the phrase "should have known" only in passing. 906 P.2d at 165. More importantly, a much more recent Kansas Supreme Court opinion clarifies the governing standard—and in a way that rejects plaintiffs' construction of *Grimmett*. *Martell*, 302 P.3d at 382. An owner of chattel incurs liability for negligent entrustment only when that owner acts "with knowledge or *reason to know* of the entrustee's incompetence[.]" *Id.* (emphasis added). *Martell* also "explicitly" embraced the Second Restatement's explanation of the negligent entrustment. *Id.* at 380. In short, the court concludes that an actor negligently entrusts only when the actor entrusts chattel "with knowledge or reason to know of the entrustee's incompetence[.]" *Id.* at 382. And "reason to know" means "the actor has information from which a person of reasonable intelligence . . . would infer that the fact in question exists[.]" Restatement (Second) of Torts § 12(1) (A.L.I. 1965). The court now applies this governing standard to this case's summary judgment facts.

This legal standard rules out many of plaintiffs' arguments. For instance, plaintiffs argue that Mr. Beauchamp was responsible for ensuring compliance with the FMCSRs, which require "drivers have the requisite knowledge and skills to operate a motor vehicle." Doc. 88 at 42. From this, plaintiffs contend that a reasonable jury could conclude that Mr. Beauchamp should have known that Mr. Borbolla-Fierro was incompetent based on his purported inability to read

traffic signs. *Id.* But whether Mr. Borbolla-Fierro could decipher traffic signs in English says nothing about whether Mr. Beauchamp knew or had reason to know that fact.

Plaintiffs next argue that Mr. Beauchamp and KB Custom used an insufficient training protocol to ready truck drivers for service. *Id.* at 42–43. This argument falls short, too. Even if defendants failed to implement a rigorous training regime, it doesn't mean that Mr. Beauchamp knew or had reason to know that Mr. Borbolla-Fierro was an incompetent driver. *See Martell*, 302 P.3d at 382 ("'An incompetent driver is one who, by reason of age, experience, physical or mental condition, or known habits of recklessness, is incapable of operating a vehicle with ordinary care.'" (quoting *McCart*, 641 P.2d at 387)). Plaintiffs' arguments that defendants should have done more to train their drivers doesn't move the needle on the inquiry into Mr. Beauchamp's subjective knowledge of Mr. Borbolla-Fierro's alleged incompetence.

But the court reaches a different result on plaintiffs' long-hours argument. Plaintiffs argue that Mr. Borbolla-Fierro worked extraordinarily long hours in the run-up to the collision. Doc. 88 at 41. For instance, he worked 176 hours between April 10, 2023, and April 23, 2023, Doc. 88-2 at 28–29 (Borbolla-Fierro Dep. 154:20–155:15), and 100 hours between May 1, 2023, and May 7, 2023. Doc. 88-1 at 21 (Beauchamp Dep. 110:17–19). And in the four days before the collision, Mr. Borbolla-Fierro "worked a 14-hour 54-minute day, 15-hour 44-minute day, 17-hour 33-minute day, and then a 12-hour 19-minute day[.]" Doc. 88 at 41. Finally, on the day of the collision, Mr. Borbolla-Fierro had started his workday at 6:29 a.m., and the collision occurred at 5:48 p.m. *Id.* Viewing this evidence in the light most favorable to plaintiffs, a reasonable jury could find that Mr. Borbolla-Fierro suffered fatigue from working extraordinary hours and that his fatigue contributed to the collision. Likewise, a jury could infer that Mr. Beauchamp—as the CEO and ultimate decisionmaker of the company—was aware of the hours

that Mr. Borbolla-Fierro was working and that he was negligent to entrust his 2015 Kenworth to a person who had worked as extensively as Mr. Bobolla-Fierro. *Cf. Terrell v. Cent. Wash. Asphalt, Inc.*, 168 F. Supp. 3d 1302, 1311–12 (D. Nev. 2016) (denying summary judgment against a negligent-entrustment claim where a jury could find that employer—who knew that its driver previously had driven in excess of the federal safety regulations—"negligently took the risk that [driver] might continue to drive long hours, and potentially drive while fatigued, if it entrusted its vehicle to him").

This conclusion isn't trivial. Mr. Beauchamp persuasively argues that he had every reason to believe Mr. Borbolla-Fierro was a capable and competent driver. Doc. 83 at 16–17. For instance, Mr. Borbolla-Fierro held a valid license to operate a motor vehicle, had driven competently for KB Custom for several years, and never was involved in a motor vehicle collision before the accident in this case. *Id.* at 16. And Mr. Beauchamp argues that regardless of the hours that Mr. Borbolla-Fierro worked, "he demonstrated his ability to competently operate a vehicle before the accident[.]" Doc. 90 at 14. No doubt, a rational jury may find this evidence sufficient. But a rational jury also could find that fatigue contributed to the collision and that Mr. Beauchamp bears responsibility for furnishing a semitruck to an employee he knew had worked enormous hours in the lead up to the collision. So the court declines to grant summary judgment on this claim and instead opts to submit the issue to a jury.

Mr. Beauchamp throws out a last-ditch argument. He argues that plaintiffs can't hold him—a member of an LLC—personally liable for KB Custom's negligence absent reason to pierce the corporate veil. Doc. 90 at 14–15. The court agrees with that much. The issue is that limited-liability protections don't shield Mr. Beauchamp from liability for his own personal negligence. *See, e.g., Gardner ex rel. L.G. v. Eighth Jud. Dist. Ct.*, 405 P.3d 651, 655 (Nev.

2017) ("[T]he statutes limiting personal liability of members and managers of an LLC for debts and obligations of the LLC are not intended to shield members or managers from liability for personal negligence.").[17]  And here, a jury reasonably could find that Mr. Beauchamp himself acted negligently by entrusting a vehicle he owned to a driver he had reason to know was incompetent.  If the jury makes such a finding, corporate-liability protections won't shield Mr. Beauchamp.

To summarize, the court grants summary judgment on plaintiffs' respondeat-superior claims against Mr. Beauchamp because he didn't have an agency relationship with Mr. Borbolla-Fierro.  But the court denies summary judgment on plaintiffs' negligent-entrustment claim against Mr. Beauchamp because a jury reasonably could conclude that Mr. Beauchamp had reason to know that Mr. Borbolla-Fierro was fatigued and incapable of competently driving the 2015 Kenworth because of the hours Mr. Borbolla-Fierro worked.

With the motions for summary judgment decided, the court turns to defendants' motion to limit the testimony of plaintiffs' expert.

### V.        Defendants' Motion to Exclude and Limit Testimony (Doc. 84)

Plaintiffs intend to offer expert testimony from Roger Allen.  Defendants have submitted a Motion to Exclude and Limit Testimony (Doc. 84).  This motion asks the court to limit Mr. Allen's testimony.  Defendants identify six categories of purportedly inadmissible testimony.

---

[17]        It's not altogether clear under which state's laws KB Custom is organized.  Defendants' briefing cites a Colorado statute on liability protections for LLCs.  Doc. 90 at 15.  Presumably, then, Colorado law governs the scope of Mr. Beauchamp's limited-liability protections.  *See Consol. Beef Indus., Inc. v. Schuyler*, 716 P.2d 544, 547 (Kan. 1986) ("The generally accepted rule is that a corporation's charter and the laws of its domicile govern with respect to the fact and duration of corporate existence and the rights and liabilities of its officers, stockholders, and directors.").  The Colorado statute limits LLC members' liability for "the alleged improper actions of the limited liability company," not for personal negligence. Col. Rev. Stat. § 7-80-107(1).  In short, the liability shield protects Mr. Beauchamp from liability for KB Custom's negligence.  It doesn't protect him from liability for his own negligence.

Doc. 85 at 1–2. The court addresses these arguments, in turn. But the court starts with the governing legal standard for determining admissible expert testimony.

### A. Daubert Standard

The court has a "gatekeeping obligation" to determine whether expert testimony is admissible. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). When performing this gatekeeping function, the court has broad discretion. *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation omitted). Courts exercise this discretion under Fed. R. Evid. 702. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Our Circuit has directed trial judges to apply a two-part test when determining admissibility of expert testimony under *Daubert* and Rule 702. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). First, the court must determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting Fed. R. Evid. 702). Second, the court "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *Id.* (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)).

To qualify as an expert witness, the witness must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (citation and internal quotation marks omitted). To determine whether an expert's testimony is reliable, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

In *Daubert*, the Supreme Court identified four factors that—though not exhaustive—trial courts should consider when determining reliability under Fed. R. Evid. 702. They are: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community. *Id.* at 593–94. The Supreme Court has emphasized, however, that these four factors are not a "definitive checklist or test," and that a court's gatekeeping inquiry about reliability "must be tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150 (citations and internal quotation marks omitted).

But in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," instead of the *Daubert* factors and scientific foundation. *Id.* For such testimony to meet the reliability standard, it "must be 'based on actual knowledge, and not mere "subjective belief or unsupported speculation."'" *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341–42 (10th Cir. 2017) (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 780 (10th Cir. 1999) (quoting *Daubert*, 509 U.S. at 590)). "When expert opinion 'is not supported by sufficient facts to validate it in the eyes of the law, or when

indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict' and will be excluded." *Id.* at 1342 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

"The proponent of expert testimony bears the burden of showing that the testimony is admissible." *Conroy*, 707 F.3d at 1168 (citing *Nacchio*, 555 F.3d at 1241). "[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments. While *Daubert* makes the court the gatekeeper for expert testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

The court enjoys discretion to determine how to perform its gatekeeping function under *Daubert*. *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019). "The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated." *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (citations omitted); *see also United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir. 1999) ("The trial judge is granted great latitude . . . in deciding whether to hold a formal [*Daubert*] hearing."). Alternatively, the district court may satisfy its gatekeeping role without a formal *Daubert* hearing "so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Goebel*, 215 F.3d at 1087 (quoting *Daubert*, 509 U.S. at 597). Here, exercising its discretion, the court concludes that it needn't conduct a separate *Daubert* hearing to rule the defendants' motion. The parties haven't requested one. And the court has reviewed the parties'

filings and attached exhibits carefully.  The court finds that the parties have provided a sufficient record for the court to discharge its gatekeeping duty without conducting a hearing.

With that standard outlined, the court now turns to the categories of testimony that defendants argue are inadmissible.

### B.    Daubert Analysis

As an initial matter, the court finds that Mr. Allen is qualified to render expert opinions. *See Nacchio*, 555 F.3d at 1241.  His extensive experience in the trucking industry qualifies him to testify about the trucking industry and its standards and customs.  *Abbott v. Mega Trucking, LLC*, No. 20-CV-776-WKW, 2023 WL 2640203, at *5 n.4 (M.D. Ala. Mar. 24, 2023) (compiling cases) ("To the extent Defendants dispute Mr. Allen's qualification, the court agrees with the general consensus among courts that Mr. Allen is an expert in commercial trucking safety standards and practice." (quotation cleaned up)); *Brown v. M & N Eaves*, No. 21-cv-959-KPJ, 2022 WL 17812441, at *3 (E.D. Tex. Dec. 19, 2022) ("The Court finds Mr. Allen is qualified to offer expert opinions under Rule 702 with respect to the applicable safety regulations, including the FMCSR.").[18]  (As the court discusses below, this conclusion doesn't mean Mr. Allen is an expert in all subjects.)  And except as noted in its analysis, below, the court finds that Mr. Allen's qualifications make his opinions about trucking-industry standards and customs sufficiently reliable.  *Van Winkle v. Rogers*, No. 19-CV-01264, 2022 WL 4231013, at *5 (W.D. La. Sept. 13, 2022) ("Allen's opinions on industry standards and Defendants' compliance with industry standards are sufficiently reliable to survive a challenge under *Daubert*.").

---

[18]    Mr. Allen apparently testifies frequently in federal court.  The cases that the court cites that reference "Mr. Allen" all refer to plaintiffs' expert here, Roger Allen.

The court now addresses the specific challenges to Mr. Allen's proposed testimony that defendants raise, starting with impermissible legal conclusions.

### 1. Legal Conclusions

Defendants first contend that Mr. Allen can't testify about legal conclusions. Doc. 85 at 6–11. And they identify 30 opinions from Mr. Allen's report that—they contend—amount to legal conclusions. *Id.* at 6–10. Plaintiffs, for their part, argue that the court should permit Mr. Allen to testify about standard of care and that some of the challenged 30 opinions aren't legal conclusions all. Doc. 89 at 8–11.

Black-letter law dictates that experts—including Mr. Allen—may not offer testimony in the form of legal conclusions. *E.g.*, *United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015) ("To ensure testimony is helpful, an expert may not state legal conclusions drawn by applying the law to the facts, but an expert may refer to the law in expressing his or her opinion." (quotation cleaned up)); *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003) ("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." (quotation cleaned up)). So, for instance, Mr. Allen may not testify about whether defendants were negligent or reckless. *See Asbury v. MNT, Inc.*, 12–252 KG/RHS, 2014 WL 6674475, at *14–15 (D.N.M. Aug. 6, 2014) (excluding Mr. Allen's testimony that defendant's "conduct was not only negligent but in my opinion careless and reckless"). Nor may Mr. Allen testify about duties the defendants might have owed, "for the existence of a legal duty lies within the sole province of the court." *Mayotte v. U.S. Bank Nat'l Ass'n*, 985 F.3d 1248, 1252 (10th Cir. 2021). And while Mr. Allen may "refer to the law in expressing [his] opinion[,]" he may not rely on "specialized legal term[s]" like proximate cause and negligence. *United States v. Schneider*, 704 F.3d 1287, 1294 (10th Cir. 2013); *see also United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) ("We identify

45

improper legal conclusions by determining whether the terms used by the witness have a separate, distinct, and specialized meaning in the law different from that present in the vernacular." (quotation cleaned up)) (quoted and cited approvingly in *Richter*, 796 F.3d at 1196).

The court thus grants defendants' motion in part.  Mr. Allen may not testify about the following subjects:

- whether KB Custom owed a duty to ensure its drivers understand and obey traffic laws;

- whether KB Custom owed a duty to ensure that its drivers' training and knowledge was sufficient;

- whether KB Custom allowed Mr. Borbolla-Fierro to operate KB Custom's equipment in violation of FMCSRs;

- whether Mr. Borbolla-Fierro owed a duty not to operate a commercial motor vehicle while fatigued;

- whether KB Custom assumed legal responsibility for Mr. Borbolla-Fierro's conduct at the time of the collision;

- whether KB Custom must follow regulations, state laws, and safety rules and standards;

- whether—and to what extent—KB Custom violated certain FMCSRs;

- whether it is clear that defendants ignored FMCSRs;

- whether defendants recklessly caused the collision;

- whether defendants are responsible legally for the collision and damages that resulted from it;

- whether KB Custom acted recklessly;

- whether the collision was preventable, *see Trinidad v. Moore*, No. 15CV323-WHA, 2016 WL 5239866, at *6 (M.D. Ala. Sept. 20, 2016) (excluding testimony that accident was "preventable" as an impermissible legal conclusion because it relied on a definition of the National Safety Council);[19]

---

[19]     Mr. Allen's report employs the legal definition of "preventable" recited in the Commercial Vehicle Preventable Accident Manual and the FMCSRs.  Doc. 85-3 at 29 (Allen Expert Report).

- whether and to what extent KB Custom showed a reckless disregard for public safety and the safety of its drivers;

- whether KB Custom acted negligently in its hiring, training, and supervision of Mr. Borbolla-Fierro;

- whether KB Custom acted negligently in failing to enforce internal policies by allowing Mr. Borbolla-Fierro to drive while fatigued;

- whether Mr. Borbolla-Fierro violated governing law by driving while fatigued;

- whether Mr. Borbolla-Fierro was negligent;

- whether KB Custom acted with gross negligence;

- whether Mr. Borbolla-Fierro acted with gross negligence;

- whether KB Custom owed a duty to have a driver training program and ensure its drivers were qualified and familiar with FMCSRs;

- whether KB Custom owed a duty under the FMCSRs to have a maintenance program and keep records;

- whether defendants acted with gross negligence and with reckless disregard for the safety and well-being of the public and motorists.[20]

On the other hand, Mr. Allen properly may testify generally about the standard of care within the trucking industry. *See, e.g.*, *Martinez v. Cont'l Tire for Ams., LLC*, No. 17-cv-00922-KWR-JFR, 2020 WL 5943691, at *4 (D.N.M. Oct. 7, 2020) ("Generally, an expert in a negligence action may opine on the standard of care and the breach of that standard."); *Schulze v. United States*, No. 18-CV-00130-GKF-JFJ, 2019 WL 1526877, at *4 (N.D. Okla. Apr. 8, 2019)

---

[20] These bulleted topics roughly correspond to numbers 1, 2, 4 (in part—as discussed further below, the court declines to exclude testimony about industry standards and whether defendants' conduct fell below industry standards), 6, 7, 9, 10, 11, 12 (in part—testimony about whether defendants' conduct jeopardized public safety isn't a legal conclusion, but as the court discusses below, Mr. Allen may not opine on causation), 13 (in part—testimony about factual causation isn't an impermissible legal conclusion, but the court concludes, below, that Mr. Allen's causation testimony isn't helpful or isn't reliable), 14, 15 (in part—the court takes up the causation part of this opinion, below), 17, 18, 20, 21, 23 (in part—Mr. Allen may testify about industry safety standards and whether Mr. Borbolla-Fierro's conduct fell below industry standards), 24, 26, 27, 28, 29 and 30 on defendants' list identifying purportedly inadmissible legal conclusions. *See* Doc. 85 at 6–10.

("Expert testimony is ordinarily necessary to establish the standard of care in professional negligence cases.").

And some of the topics that defendants' challenges have identified aren't legal conclusions. These include the following subjects of testimony:

- whether KB Custom demonstrated disregard for the public's safety and its drivers by failing to qualify Mr. Borbolla-Fierro;

- whether KB Custom offered an inadequate training program and failed to take proper precautions to ensure its vehicles and drivers were qualified to operate in a safe condition;

- whether and to what extent the FMCSRs are relevant to minimum standards in the motor carrier industry (a topic the court addresses in more depth, below);

- whether KB Custom failed to use ordinary care;

- whether KB Custom insufficiently considered industry standards in its hiring, training, and supervision of Mr. Borbolla-Fierro; and

- whether Mr. Borbolla-Fierro failed to act as a reasonably safe and prudent operator by failing to yield.[21]

The court now turns to the next category of testimony that defendants contend is out of bounds: the Federal Motor Carrier Safety Regulations.

## 2. Federal Motor Carrier Safety Regulations

Defendants next argue that Mr. Allen may not testify about the FMCSRs. Doc. 85 at 11–15. The court agrees with them, but only in part.

"There is a persuasive consensus among district courts that the meaning of a federal regulation and whether a party has violated that regulation are questions of law for the court."

---

[21]    These items roughly correspond to numbers 3, 5, 8, 14, 19, and 22 (in part—Mr. Allen may not opine on whether defendants abided the FMCSRs).

The court takes up the causation issue raised in items 16 and 25, below. *See* § V.B.3. The court concludes that Mr. Allen's causation testimony isn't reliable or isn't helpful to the trier of fact.

*Abbott*, 2023 WL 2640203, at *6 (collecting cases).  Mr. Allen thus "cannot testify that a particular FMCSR applies to Defendants or tell the jury that a Defendant violated an applicable FMCSR or duty through specified actions."  *Id.* at *8.

But "[t]his finding does not mean that Mr. Allen cannot opine at all about the FMCSRs." *Id.* at *7.  Courts routinely permit expert testimony on the standard of care, including testimony embracing federal regulations.  *E.g.*, *id.* at *8 ("[A] qualified expert like Mr. Allen may opine on how the FMCSRs are understood within the trucking industry and whether different hypothetical facts would deviate from a specified standard of care under the FMCSRs.  Mr. Allen is an industry expert on trucking standards, and he can testify generally about how these regulations apply to different factual scenarios as a matter of industry custom to motor carriers."); *Martinez*, 2020 WL 5943691, at *5 (collecting cases) ("[A]n expert is not prohibited from testifying about the standard of care in his industry merely because federal regulations form part of those standards."); *Rutstein v. Cindy's Trucking of Ill., Inc.*, 2012 WL 8813611, at *4 (D. Wyo. Aug. 8, 2012) (permitting testimony about expert's "understanding of the Federal Motor Carrier Regulations as well his knowledge and understanding of the practices and standards in the commercial trucking industry" but excluding testimony about whether "any actions by Defendants would constitute a violation of law"); *Asbury*, 2014 WL 6674475, at *9 (permitting Mr. Allen to testify about industry standards and practices and FMCSRs).  After all, "common sense suggests that trucking industry practices around safety are heavily influenced by the regulations on the industry."  *Trinidad*, 2016 WL 5239866, at *5 (quotation cleaned up).  And this testimony likely would help a jury of laypeople, who presumably aren't familiar with trucking industry standards and practices.  *See Valyou v. Vannest*, No. 15–CV–0191–S, 2016 WL 7664288, at * 3 (D. Wyo. Sept. 19, 2016) ("[A] typical juror most likely does not have any

significant knowledge and experience with the federal regulations surrounding the trucking industry.").

In short, Mr. Allen may not testify about the meaning of the FMCSRs, whether the FMCSRs applied, or whether defendants violated the FMCSRs. He may testify, however, about the standard of care within the trucking industry. And that testimony may reference how the FMCSRs are understood within the trucking industry and how they influence the trucking industry's standard of care. *See Allen v. Cam's Transp. Co.*, No. 22-CV-403-KAC-DCP, 2024 WL 3970897, at (E.D. Tenn. June 24, 2024) ("[Expert] may introduce FMCSR and may testify about his knowledge and understanding of the practices and standards in the commercial trucking industry, but he may not offer any opinions about the applicability of the FMCSR to defendants or about defendants' compliance with the FMCSR because those opinions would constitute impermissible legal conclusions that are reserved for the court and the jury." (quotation cleaned up)).

With those standards outlined, the court determines that Mr. Allen may not testify about the following:

- whether and how KB Custom was required to abide the FMCSRs;

- whether KB Custom had a duty to maintain driver-qualification files;

- what documents the FMCSRs require employers to maintain on their drivers;

- whether Mr. Borbolla-Fierro's driver-qualification file violated any FMCSR;

- whether defendants properly documented the pre-employment drug and alcohol test they administered to Mr. Borbolla-Fierro under the FMCSRs;

- what duties FMCSRs establish to qualify drivers;

- whether defendants violated FMCSRs because of Mr. Borbolla-Fierro's purported delay in summoning emergency services;

- whether Mr. Borbolla-Fierro violated an FMCSR by allegedly failing to understand a yield sign;

- whether defendants violated an FMCSR by allowing an unqualified driver to operate a commercial motor vehicle; and

- whether Mr. Borbolla-Fierro violated regulations by driving excessive hours.[22]

The court, in contrast, declines to exclude the following subjects of testimony from Mr. Allen:

- whether defendants should have required Mr. Borbolla-Fierro to perform a road test—as long as this opinion is based on industry standards and customs;

- whether Mr. Borbolla-Fierro's inability to summon emergency services promptly fell below industry standards;

- whether defendants required drivers to work excessive hours in violation of industry standards;

- whether defendants' training program fell below industry standards; and

- whether the hours that Mr. Borbolla-Fierro worked exceeded industry standards.[23]

Defendants also argue that Mr. Allen may not testify about industry standards pertaining to §§ 391 and 395 of the FMCSRs because defendants were exempt from these provisions. *See* Doc. 91 at 2–4. Recall that the court already granted summary judgment against any negligence-per-se theory that relies on proving defendants violated a provision from one of these sections. *See above* § IV.B. Still, the court disagrees with defendants' argument here. True, plaintiffs may not rely on these provisions to support a claim based on negligence per se. But they may rely on industry customs and standards connected to these provisions to support an ordinary-negligence theory. Consistent with the authority cited above, Mr. Allen may testify about industry standards as they relate to §§ 391 and 395 of the FMCSRs. *Cf. Chavez-Matchie v. Jack*

---

[22]    These items correspond to numbers 1–10, 15, and 16 on the list of items defendants contend are inadmissible FMCSR opinions.  *See* Doc. 85 at 11–13.

[23]    These correspond to numbers 11–14 and 17 on the list of items defendants contend are inadmissible FMCSR opinions.  *See* Doc. 85 at 11–13.

*Cooper Transp. Co.*, No. 16-2832-JAR-GEB, 2017 WL 2378334, at *4 (D. Kan. June 1, 2017)

("While it is true that the FMCSRs do not define their legal duty in this case, it is also true that

the regulations may be relevant and admissible.").  He must not interpret these provisions,

however, or opine whether they applied or whether defendants violated them.

To summarize, Mr. Allen may not interpret federal regulations, opine on whether any

federal regulation applied, or testify that defendants violated any federal regulation.  But he may

testify about industry standards as they relate to federal regulations and may opine that

defendants' conduct fell below industry standards.

The court next addresses defendants' argument that the court should exclude some of Mr.

Allen's proposed testimony as unhelpful to the trier of fact.

### 3.  Unhelpful Testimony

Defendants next contend that three subjects from Mr. Allen's expert report wouldn't aid

the jury.  Doc. 85 at 16–17.  These include testimony about whether Mr. Borbolla-Fierro

understood yield signs; whether Mr. Borbolla-Fierro failed to yield the right of way; and whether

fatigue was a cause of the accident.  *Id.* at 16.  The court agrees with defendants, but only in part.

Start with the yield-sign arguments.  Mr. Allen may not testify about whether Mr.

Borbolla-Fierro's deposition testimony reflects an understanding of Kansas law.  *See* Doc. 85-3

at 17 (Allen Expert Report) (opining that Mr. Borbolla-Fierro's testimony about yield signs was

"contrary to Kansas Law").  That's because Mr. Allen may not interpret Kansas law.  *See*

*Richter*, 796 F.3d at 1195 (prohibiting experts from offering legal conclusions).  That's the

court's job.  But Mr. Allen may testify about trucking industry standards and practices as they

relate to yield signs.  *See Bautista v. MVT Servs., LLC*, No. 16-cv-01086-NYW, 2017 WL

6054888, at *8 (D. Colo. Dec. 7, 2017) ("[I]ndustry standards are relevant to the jury's

assessment of negligence, and this court is persuaded that an average layperson does not have common knowledge of the driving standards applicable to commercial truck drivers.").

Next, Mr. Allen may not testify whether Mr. Borbolla-Fierro failed to yield. No specialized knowledge is necessary to make that determination. *See Deliefde v. Nixon*, No. 19-CV-226-DPJ-FKB, 2021 WL 4164680, at *14 (S.D. Miss. Sept. 13, 2021) (excluding Mr. Allen's testimony where it wasn't based on "'scientific, technical, or other specialized knowledge'" (quoting Fed. R. Evid. 702(a))). So, the court excludes this putative testimony because a jury doesn't need expert assistance to understand whether a driver failed to yield a right of way. The jury "is equally capable of drawing those conclusions." *Id.*

Nor may Mr. Allen testify whether fatigue was a cause of the accident. His testimony wouldn't aid the jury because laypeople understand fatigue. *See Davis ex rel. J.W. v. Grant*, No. 21-0005-KD-M, 2022 WL 1557377, at *8 (S.D. Ala. May 17, 2022) ("Johnson's opinions regarding Grant's fatigue—in isolation—are unhelpful to the jury because such is within that which is generally known by the average man."). Courts regularly reach this conclusion and exclude expert testimony about fatigue and its causal relationship to motor vehicle accidents. *See, e.g.*, *id.*; *Bridges v. Enter. Prod. Co.*, No. 05cv786-WHB-LRA, 2007 WL 465738, at *4 (S.D. Miss. Feb. 8, 2007) ("The Court finds Maxwell's opinions regarding whether Toulmon was fatigued and whether that fatigue proximately caused the subject collision are not required to assist the jury in understanding the evidence or facts in this case. The Court finds that the effects of driving extended periods of time are generally known by the 'average man.' Therefore, the jury can decide for itself whether Toulmon was fatigued based on the number of hours he drove, and whether that fatigue, if any, proximately caused or contributed to the subject collision."); *Ryans v. Koch Foods, LLC*, No. 13-cv-234-SKL, 2015 WL 11108937, at *6 (E.D. Tenn. July 16,

2015) (holding that "the jury could draw its own conclusions" because the "effects of fatigue on a driver are matters of common knowledge"). In short, Mr. Allen may not testify whether fatigue caused the accident. He may testify about industry standards and practices related to fatigue and whether defendants' conduct deviated below those standards.

Relatedly, Mr. Allen's report fails to identify a reliable methodology for how he concludes that defendants' failure to abide minimal safety standards caused the accident. *See* Doc. 85-3 at 27–32 (Allen Expert Report). His explanation amounts to little more than his subjective say so, which won't suffice under *Daubert*. *See Goebel v. Denv. & Rio Grande W. R.R.*, 346 F.3d 987, 991 (10th Cir. 2003) ("To be reliable under *Daubert*, an expert's scientific testimony must be based on scientific knowledge, which implies a grounding in the methods and procedures of science based on actual knowledge, not mere subjective belief or unsupported speculation." (quotation cleaned up)); *see also Abbott*, 2023 WL 2640203, at *11 ("Although Mr. Allen is an expert in the trucking industry, without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." (quotation cleaned up)). So, Mr. Allen may not opine about a causal connection between defendants' purported violations of safety regulations and the collision. In short, Mr. Allen may testify about industry standards and whether defendants violated them. He may not speculate, however, about whether these violations caused plaintiffs' injuries.[24]

---

[24] The court recognizes that defendants didn't object to Mr. Allen's causation opinions on a reliability basis. Defendants argued that Mr. Allen's causation opinions are impermissible legal conclusions. Doc. 85 at 8–9. But, as the court has explained, these opinions more clearly are inadmissible because they aren't reliable. Because defendants raised the causation-opinions issue, "the court is not limited to the particular legal theories advanced by the parties[.]" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *United States v. Cortez-Nieto*, 43 F.4th 1034, 1052 (10th Cir. 2022) ("The [party-presentation] principle does not say that once an issue has been raised and responded to, a court must render its decision in accordance with the position of one of the parties. Courts have always had authority to resolve raised issues as fairness requires."). Irrespective of these party-presentation concerns, our Circuit has suggested that the court must screen expert testimony even in the absence of

To summarize, Mr. Allen may not testify about whether Mr. Borbolla-Fierro understood yield signs; whether he failed to yield; or whether his fatigue caused the accident.

### 4. Undisclosed Expert's Testimony

Defendants next ask the court to prevent Mr. Allen from testifying that Mr. "Borbolla-Fierro failed to yield the right of way." Doc. 85 at 17–18. They explain that Mr. Allen bases his opinion on a report from Kansas Highway Patrol Trooper Clayton Tarpley, who plaintiffs didn't designate as an expert. *Id.* at 17. Thus, defendants argue, Mr. Allen can't "bootstrap in Trooper Tarpley's liability opinion." *Id.* Plaintiffs respond, conceding that they "will not solicit testimony from Allen concerning Trooper Tarpley's Report[.]" Doc. 89 at 15. But, plaintiffs assert, Mr. Allen may "rely on reports from law[ ]enforcement such as the report from Trooper Reed[.]" *Id.* Defendants don't respond to this argument. *See generally* Doc. 91.

The court agrees with the parties. Mr. Allen may not "simply parrot[]" testimony from another expert such that he "becomes little more than a backdoor conduit for" another witness. *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012). Still, Mr. Allen properly may rely on police reports to form his opinions. *See Bautista*, 2017 WL 6054888, at *7 (permitting Mr. Allen to "rely upon [an accident report] as it appears that police reports are routinely used and considered by experts to provide factual background, or even to render opinions regarding causation"). In short, the court grants defendants' uncontested request to limit Mr. Allen's testimony by excluding references to Trooper Tarpley's report. At this juncture, the court won't further limit the evidence on which Mr. Allen may rely or reference. And as the court already

---

objection. *See Leonard v. HMG Park Manor of Salina, LLC*, No. 24-3009, 2025 WL 635752, at *7 (10th Cir. Feb. 27, 2025) ("[A] district court is required to enforce the *Daubert* safeguards, even if the opposing party fails to challenge the admissibility of an expert's testimony. . . . If a district court is to play the role of 'gatekeeper,' it must ensure only valid expert testimony reaches a jury, even if the opposing party fails to file a *Daubert* motion.").

has explained, testimony about whether Mr. Borbolla-Fierro failed to yield the right of way wouldn't help the trier of fact.

### 5.  Unqualified Opinions

Defendants argue that Mr. Allen lacks the "skill, training, and experience" to opine on whether delays in contacting emergency personnel may reduce the likelihood of avoiding fatality following a collision.  Doc. 85 at 18.  Plaintiffs disagree, arguing that Mr. Allen's extensive experience in the industry—including previous experience as a safety director—qualifies him to opine about the effect of delays in contacting emergency personnel.  Doc. 89 at 16.

Mr. Allen doesn't have any medical expertise that would allow him to provide an informed opinion about the *medical* effect of a delay in contacting emergency personnel. Plaintiffs all but concede this limitation.  *See* Doc. 89 at 16 ("As a safety and compliance expert, Allen is *only* discussing the driver's responsibility in contacting EMS to [request] potentially lifesaving care." (emphasis added)).  On the other hand, the court agrees with plaintiffs that Mr. Allen has extensive experience and qualifications about the trucking industry and safety within the trucking industry.  So, Mr. Allen may offer testimony on industry standards regarding a driver's responsibility to summon emergency services.  The court thus grants defendants' request on this point in part.  Mr. Allen can't opine about the medical effect—including any effect on the decedent's likelihood of survival—from any delay in calling emergency services.  But he may offer standard-of-care testimony about industry customs as they relate to summoning emergency services after a collision.

### 6.  Post-Accident Conduct

Defendants next argue that the court shouldn't allow Mr. Allen to testify about KB Custom's post-accident conduct.  Doc. 85 at 18–19.  Specifically, they contend that Mr. Allen's opinion that KB Custom would have determined that the accident was preventable if they had

"done a root cause analysis" isn't admissible. *Id.* Plaintiffs disagree, arguing that Mr. Allen's post-conduct opinions go "to bias and interest on the part of KB's safety director . . . , which is extremely relevant." Doc. 89 at 17. The court agrees with defendants—at least at this juncture. Mr. Allen may not testify about defendants' post-accident investigation or failure to investigate because it isn't relevant—or at least not sufficiently so to outweigh potential prejudice. *See, e.g.*, *Asbury*, 2014 WL 6674475, at *11–12 (excluding Mr. Allen's post-incident conduct under Rule 403 and Rule 404); *Bautista*, 2017 WL 6054888, at *7 (excluding Mr. Allen's testimony about defendant's "post-accident investigation").

Plaintiffs' only counterargument isn't persuasive. In essence, they argue that Mr. Allen's opinion about KB Custom's investigation is relevant to impeach testimony from KB Custom's safety director. It's premature to determine whether Mr. Allen properly may offer impeachment testimony in rebuttal. That's so because KB Custom's safety director hasn't testified yet. At least in plaintiffs' case-in-chief, Mr. Allen may not testify about defendants' post-accident investigation or lack thereof.

### 7. Daubert Conclusions

The court thus grants in part and denies in part defendants' Motion to Exclude and Limit Testimony (Doc. 84). Here's the quick version of the court's rulings on defendants' motion. Mr. Allen may not testify about the following:

- legal conclusions, including interpreting the FMCSRs, explaining whether they apply, or opining on whether defendants violated them;

- whether Mr. Borbolla-Fierro understood yield signs and whether he failed to yield the right of way;

- whether Mr. Borbolla-Fierro's alleged fatigue caused the accident;

- whether defendants' failure to abide industry customs and practices caused the accident;

- testimony that references Trooper Tarpley's report (though Mr. Allen may rely on that report to inform his opinions);

- whether Mr. Borbolla-Fierro's alleged delay in summoning emergency services adversely affected the decedent's survival chances; and

- defendants' post-accident investigation.

## VI.    Conclusion

To summarize, the court denies plaintiffs' Motion for Partial Summary Judgment (Doc. 79) because a genuine issue of material fact exists about whether Mr. Ferrell supplied or furnished the Kia Optima to the decedent.  The court grants in part and denies in part defendants' Motion for Partial Summary Judgment (Doc. 82).  The court agrees that plaintiffs must join S.F. as a party to pursue a wrongful-death claim, and the court initiates a process to determine whether Dave Rebein will serve as her guardian ad litem.  Defendants are exempt from §§ 391 and 395 of the FMCSRs, as explained above, so plaintiffs can't pursue a negligence-per-se claim based on violations of those provisions.  And the court grants summary judgment against plaintiffs' respondeat-superior claims against Mr. Beauchamp but denies summary judgment against plaintiffs' negligent-entrustment claim against Mr. Beauchamp.  Finally, the court grants in part and denies in part defendants' Motion to Exclude and Limit Testimony (Doc. 84), as explained above.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion for Partial Summary Judgment (Doc. 79) is denied.

**IT IS FURTHER ORDERED THAT** defendants' Motion for Partial Summary Judgment (Doc. 82) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** the Pretrial Order is amended to remove James Eric Ferrell, individually and on behalf of the heirs of Jacob Williams Ferrell, as a plaintiff in this case.  S.F. is added as a plaintiff.

**IT IS FURTHER ORDERED THAT** the parties must file any written objections to David Rebein serving as S.F.'s guardian ad litem within seven days after the date when this Order issues.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Exclude and Limit Testimony (Doc. 84) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 25th day of August 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**